MARGARET K. MARTIN v. WALTER COURTNEY.

January 12, 1899.

Nos. 11,368—(206).

Malpractice—Test of Treatment—Same School of Medicine.

In an action for malpractice, a physician or surgeon is entitled to have his treatment of his patient tested by the rules and principles of the school of medicine to which he belongs.

Expert Witness—Competency Question for Court.

The question of the competency of a witness to testify as an expert is one exclusively for the court, and all the evidence as to his competency

should be received and considered by the court before permitting the witness to testify.

## Verdict—Abuse of Discretion to Refuse New Trial.

In this case the preponderance of the evidence against the verdict was so great that it was an abuse of discretion not to grant a new trial, and submit the case to another jury.

Action in the district court for Crow Wing county by the administratrix of Joseph A. Martin, deceased, to recover $5,000 for his death, alleged to have been caused through the malpractice of defendant. The cause was tried before Holland, J., and a jury, which rendered a verdict for $1,250 in favor of plaintiff. From an order denying a motion for a new trial, defendant appealed. Reversed.

*McClenahan & Mantor* and *How & Butler*, for appellant.

The question of competency of an expert is one of fact for the court alone. Beckett v. N. W. Masonic A. Assn., 67 Minn. 298, 302. The law only requires of one who holds himself out as a physician, to exercise the same skill and care as is ordinarily exercised by physicians in good standing who belong to the same school of medicine and practice. Nelson v. Harrington, 72 Wis. 591; Patten v. Wiggin, 51 Me. 594. Dr. Gray's testimony was incompetent. It does not appear that he had any experience to qualify him to testify as to allopathic rules and principles of practice. See Soquet v. State, 72 Wis. 659; Boyle v. State, 57 Wis. 472. The rule of liability in actions for malpractice is laid down in Getchell v. Hill, 21 Minn. 464.

*F. M. Nye*, for respondent.

On questions of science or skill, or relating to some art or trade, persons instructed therein by study or experience may give their opinion. Lawson, Exp. Op. Ev. 2. See also Sneda v. Libera, 65 Minn. 337; Sowers v. Dukes, 8 Minn. 6 (23). An expert may be qualified by study without practice, or by practice without study. Lawson, Exp. Op. Ev. 210, 211. The law does not recognize, to the exclusion of others, any particular school of medicine or class of medical practitioners. Id. 115, et seq. See also Id. 236, et seq.; Sneda v. Libera, supra; Beckett v. N. W. Masonic A. Assn., 67

Minn. 298; Peterson v. Johnson-Wentworth Co., 70 Minn. 538; Stevens v. City of Minneapolis, 42 Minn. 136; Olson v. Gjertsen, 42 Minn. 407.

MITCHELL, J.

The defendant is a physician and surgeon, who has been for a number of years in charge of the Northern Pacific Sanitarium or Hospital at Brainerd, in the capacity of chief surgeon. This action was brought for alleged malpractice, causing the death of plaintiff's husband.

On May 24, 1895, the deceased, an employee of the Northern Pacific Railroad Company, had the toes of one foot crushed by a car wheel running over them. The injured parts were amputated at Superior, Wisconsin, and the next day he was brought to Brainerd, and placed in the hospital, under the treatment of the defendant, where he remained until July 16. During that time his wound healed gradually, but very slowly, indicating that he had a low degree of power to resist or throw off disease.

By the date last named the wound had all healed, except a small spot about the size of the end of an ordinary lead pencil. The defendant then advised the deceased to leave the hospital, and return to his home, which was in Brainerd, but to come to the hospital every day or two to have his foot examined and treated. The deceased followed this advice. The defendant, removing all the other dressings, put some collodium on the spot which had not healed, and a gauze sock on his foot. The evidence does not show the character of this gauze, but some things crop out which seem to imply that it was iodoform gauze. The deceased then went to his home, where he stayed during the remainder of the summer, but going to the hospital periodically, as directed, to have his foot examined and treated.

For a time the wound seemed to be healing satisfactorily, but about the middle of September it gave signs of breaking out again, and the foot assumed a somewhat reddish color almost up to the ankle, indicating, as we think the evidence tended to show, that the wound was in a somewhat septic condition, and that the foot was more or less infected as far as the reddish appearance extend-

ed; but defendant testified that he believed and thought that the reddish appearance was a slight irritation of the skin, caused by the iodoform gauze used in dressing.

On September 16, upon the advice of the defendant, he returned to the hospital, where another operation was performed by amputating an additional quarter of an inch of the foot. The patient, however, gradually grew worse, and finally died of sepsis, or blood poisoning, on October 23, the disease spreading very rapidly towards the last.

Speaking generally, the only respects in which the defendant's treatment is complained of are: First, that when the deceased left the hospital, in July, and thereafter, the wound was not sufficiently protected from infection by septic germs; and, second, that the second amputation should have been made at the ankle, so as to remove the entire infected district.

Upon the trial the plaintiff was called as a witness in her own behalf, and testified as to the conditions and symptoms which her husband exhibited from time to time while under the care of the defendant, and as to the course of treatment followed by the defendant and his assistant. The plaintiff then called Dr. Camp, a physician and surgeon, who knew the deceased in his lifetime, and had seen him in his last sickness; but he—evidently to the surprise of counsel—fully approved of defendant's treatment as correct and proper.

The plaintiff next called as an expert witness Dr. Gray, a physician and surgeon belonging to what is known as the homeopathic school of medicine, and proposed to have him give his opinion, based upon the plaintiff's testimony, whether defendant's treatment of the case was proper. Defendant belongs to what is known as the allopathic or regular school of medicine, and was entitled to have his treatment tested by the rules and principles of that school, and not of some other school. Nelson v. Harrington, 72 Wis. 591, 40 N. W. 228; Patten v. Wiggin, 51 Me. 594.

Objection having been made on this ground to the competency of Dr. Gray as an expert, he, on his preliminary examination, testified that there was a decided difference between the rules and principles of the two schools as respects the "practice of medicine," but not

as respects surgery. When inquired of as to whether the two schools differed as to their treatment of sepsis, his testimony was, as nearly as we can understand it, that they have the same rules in regard to the treatment of sepsis connected with surgery; but, where the condition of sepsis has developed a diseased condition, it becomes a question of disease, and not surgery, and in such case the rules of treatment of the two schools of medicine would be entirely different.

Upon the question of Dr. Gray's competency defendant's counsel offered to introduce other professional testimony to show that the two schools are hostile to each other in their rules as to the treatment of sepsis, even in cases connected with surgery. The court excluded this evidence, and permitted Dr. Gray to testify as an expert, saying that perhaps the offered evidence might be admitted later. We think this was error.

The question of the competency of the witness to testify as an expert was one for the court, and not for the jury, and the defendant should have been permitted to present to the court on the preliminary examination all competent evidence on the question. The competency of the witness did not depend wholly upon his knowledge or skill as a physician and surgeon, but also upon the question whether he would apply the correct rules and principles in giving his opinion as to the defendant's treatment of the deceased.

It is true that the witness testified that his "course of instruction had compassed the field of the allopathic course of study," but this would not help matters if he applied the wrong rules and principles to defendant's treatment. He may have, and probably did, give his testimony as to the propriety of this treatment upon the assumption that the rules and principles of the two schools were the same in a case of sepsis connected with surgery; but, if he was mistaken in this assumption, he would be testing defendant's treatment by a wrong standard.

2. It is also claimed that the court erred in not granting a new trial on the ground that the verdict, which was in favor of the plaintiff, was not justified by the evidence. When Dr. Gray's testimony closed, the plaintiff rested. The defendant himself and his assistant surgeon were called, and testified at great length and

with great particularity as to the history of the case, the conditions and symptoms of the deceased, and the treatment applied from the day the deceased entered the hospital until his death; and further testified that in their opinion the treatment applied was proper.

Two other medical experts—one of 17 and the other of over 22 years' experience—testified that, in their opinion, based upon testimony of the defendant and his assistant, the treatment of the case by the defendant was in all respects proper, and in accordance with the rules and principles of surgery and the practice of medicine; and they very emphatically joined issue with the opinion expressed by Dr. Gray that good surgery required that the second amputation should have been made at the ankle.

Dr. Gray, upon whose testimony the plaintiff's whole case practically rested, expressed his opinion quite positively that defendant's treatment of the case was unskillful and improper in the two respects already referred to, viz. (1) in not properly protecting the wound against infection by septic germs, and (2) in not making the second amputation at the ankle. The doctor had never seen the deceased, but based his opinion exclusively upon the testimony of the plaintiff, which, of course, was given from the standpoint of a layman. Without meaning to cast any reflection upon his skill, Dr. Gray was not a physician and surgeon of any large experience, having graduated from the medical school less than five years before the trial.

The defendant himself was a physician and surgeon of 15 years' experience, and had for several years occupied the position of chief surgeon of this hospital. He is not charged with neglect of his patient. What Dr. Gray charged him with was lack of professional judgment and skill in the treatment of the case.

Hence, excluding the testimony of defendant and his assistant, who may both be considered interested witnesses, there were three disinterested witnesses of quite large experience, who expressed the opinion (based in one instance largely upon his personal knowledge, and in the other two instances on the testimony of defendant and his assistant, who were medical men, as to the history and treatment of the case) that defendant's treatment was proper, as

against the testimony of one witness of limited experience (based entirely upon the testimony of the nonexpert plaintiff) that defendant's treatment was improper and unskillful.

Of course, evidence is to be weighed, and not measured; but here was a case where, from its very nature, the jury was compelled to rely almost exclusively upon the opinion evidence of medical experts. Expert evidence is at best very unsatisfactory, and is resorted to only from necessity; and, without intending to disparage a profession which contains so many eminent men of the highest skill and integrity, we are justified in saying that it is a matter of common knowledge that in almost every case requiring medical expert evidence witnesses can be found who will give opinions directly opposed to each other.

A physician or surgeon is not an insurer that he will effect a cure. Neither is he required to come up to the highest standard of skill known to the profession. When he accepts professional employment, he is only bound to exercise such reasonable care and skill as is usually exercised by physicians or surgeons in good standing of the same school of practice. And where any person claims a cause of action for neglect to exercise the required degree of care or skill, the burden is upon him to prove such neglect. Getchell v. Hill, 21 Minn. 464.

In this case perhaps the most serious charge against the defendant was in not making the second amputation at the ankle. He was required to exercise ordinary professional skill and judgment in determining what was best to be done under the circumstances. Of course, the most important thing was to save the patient's life. But conservative surgery required that as much of the foot as possible should be saved. A surgeon, under the circumstances, had to take into account the great value of a foot, especially to a laboring man. In determining where to make the amputation he would also have to take into account the degree, as well as the extent, to which the foot was infected; also the general health of the patient, and his power to throw off or resist disease; and then, in view of all these considerations, act in accordance with ordinary and reasonable professional skill.

If the defendant can be found guilty of malpractice upon the

evidence in this case, it would be unsafe for any man to practice medicine or surgery. If defendant had amputated the foot at the ankle, and the patient had survived, we undertake to say that the latter would have had a much stronger case than has this plaintiff. In such case we have no doubt that not only one, but several, expert witnesses could have been found who would have testified that the foot might have been saved, and that the amputation of it was bad surgery.

While, in view of Dr. Gray's testimony, it cannot be said that there was no evidence tending to support the verdict, yet it is so manifestly against the great preponderance of the evidence that it was an abuse of discretion not to grant a new trial, and submit the case to another jury. Voge v. Penney, 74 Minn. 525, 77 N. W. 422.

It is not merely a sum of money, but also the reputation of the defendant as a physician and surgeon, which is involved, and we do not think that he should stand condemned for all time as an incompetent upon the state of the evidence disclosed by the record, without at least submitting the question to one more jury of his countrymen.

Order reversed.