MARGARET K. MARTIN v. WALTER COURTNEY.[1]

August 8, 1902.

Nos. 13,073—(166).

Malpractice—Verdict.

> In an action against a physician for malpractice, facts considered, and *held*, that the order of the trial court directing a verdict in favor of defendant should be sustained upon the view that a finding by the jury in favor of the plaintiff should have been set aside as a matter of law, since the evidence did not reasonably tend to support a verdict in her favor.

Action in the district court for Crow Wing county by plaintiff as administratrix of the estate of Joseph A. Martin, deceased, to

[1] Reported in 91 N. W. 487.

recover $5,000 for the death of decedent, alleged to have been caused by the malpractice of defendant. A change of venue was granted to Sherburne county where the case was tried before Giddings, J., who directed a verdict in favor of defendant. From an order denying a motion for a new trial, plaintiff appealed. Affirmed.

*F. D. Larrabee,* for appellant.

*How, Taylor & Mitchell* and *Pierce Butler,* for respondent. .

LOVELY, J.

After the last remand of this action (81 Minn. 112, 83 N. W. 503), a change of venue was granted from Crow Wing to Sherburne county, where the cause was again tried to a jury. At the close of the evidence the court directed a verdict for defendant. A "case" containing the evidence was duly settled, a motion for a new trial was made and denied. From this order plaintiff appeals.

The claim of Mrs. Martin, as administratrix, for the alleged negligence of defendant in the surgical treatment of her husband, has been twice before this court. The first review was upon the merits, when a new trial was granted, for the reason that the preponderance of evidence was so strongly in favor of defendant that a retrial before a new jury was required. 75 Minn. 255, 77 N. W. 813. On the last review a new trial was ordered for misconduct of plaintiff's attorney at the trial.

Upon the record now before us the only question to be considered is whether the whole evidence required a submission of the issues of fact to the jury; if so, the direction in defendant's favor was error, and should be reversed. Concededly it should be a clear case to authorize interference by the court with the functions of the jury to determine the result of the evidence. In recognizing this responsibility, the trial court held on the motion for a new trial that its direction for defendant should be sustained upon the ground that it would have been required to set aside any verdict that might have been rendered in plaintiff's favor. This is a fair test of judicial duty in such a case. It has also been held that the court should direct a verdict where the evidence has no reasonable tendency to support it. That such corrective power must

exist is essential to protect parties litigant either from palpable injustice or a plain misunderstanding of the application of the law to the facts. The exact limits of this authority are not easily prescribed nor definable. It is not an arbitrary power, but a judicial trust, confided to the court under conditions where the law can establish no fixed rule of duty, to be exercised in sound judgment of justice and right. That this authority must be enforced has the highest sanction, and without such reserved power to correct a miscarriage of justice courts would be of no more potent force than calculating machines, or moderators of public assemblies. The wisdom of this imposition of duty upon judicial tribunals is justified by a very casual reference to the reported cases, where it will be found that courts with much reluctance, but where necessity demands, have repeatedly sustained orders of this kind. Hence the importance of realizing from the record before us just conclusions upon the evidence is manifest. We are sensible of this duty, and from what we believe to have been a candid examination of the entire evidence certain results may be summarized, which are of controlling significance on this review.

Plaintiff's intestate was injured in a railroad accident at Brule, in Wisconsin, on May 24, 1895. His right foot was run over and the toes crushed by a railway car. An immediate amputation of these members was made by a local surgeon at West Superior. The next day he was removed to the Brainerd hospital, of which defendant was the superintendent, aided by an assistant and trained nurses. He remained at the hospital under defendant's care until July 16, when he returned to his home in Brainerd, but visited the hospital at frequent intervals for further treatment until September 16, when he again returned to the hospital, where a further operation was performed by the amputation of an additional portion of less than an inch of the foot. The patient continued at the hospital without pronounced improvement until October 19, when a decided change in his condition for the worse took place. He rapidly declined, and died on the afternoon of October 23, 1895.

The legal obligation of the physician to his patient, where his

conduct is questioned in an action of this character, demands of him no more than the exercise of such reasonable care and skill as is usually given by physicians or surgeons in good standing of the same school of practice. Getchell v. Hill, 21 Minn. 464; Martin v. Courtney, 75 Minn. 255, 77 N. W. 813. To exact more than this would be an unjust imposition upon the physician, to encourage expectations of miraculous power that could not be fulfilled, for he is not an insurer of absolute success. The white headstones and monuments that glisten in the sunshine within the sacred precincts devoted to the repose of the dead in the suburbs of every city in the land testify with unerring certainty that man is mortal, and the most effective efforts of the healing art are incapable of resisting the conqueror of all. The very best results of science recognize this truth. The medical art of late years has made great advances in resisting the ravages of disease, but it has its limitations, and its achievements are still but an approximation to its ideals. It is perhaps unfortunate for the profession that too much is expected from it. Confidence in the physician by the patient is essential, but it should not be such an unwavering faith in his powers as the superstitious savage gives to his medicine man, or makes success the sole metewand of duty, but rather a sensible and intelligent trust that expects reasonable efforts, and, when these have been bestowed, submits with Christian resignation to the inevitable; for "he censures God who quarrels with the imperfections of man." The ubiquitous protectorate which jurisprudence extends to all material interests and to every science and to every art takes note of our common fate, with the possibilities of failure in the professional treatment of disease, and accords the medical practitioner in every case the presumption that he has done his whole duty, which imposes upon those who challenge his conduct in the courts the burden of establishing his negligence.

The unfortunate termination of Mr. Martin's illness is without doubt attributable to septicæmia, or blood poisoning, the germs of which had existed in his system for some length of time before they were discovered. Whether discoverable by the exercise of ordinary and reasonable care by his medical attendants must be regarded as the crucial test by which, under the evidence, the order

of the trial court should be sustained or reversed. Septicæmia is a dangerous malady, apt to occur after injuries through a purulent infection of the blood where there is a possibility that insidious and occult sources of danger may exist unknown to the physician, while "rank corruption mining all within infects unseen," until relief from professional treatment, when the disease is discovered, becomes unavailing.

The description of the treatment which intestate received at the hospital is very complete. It was given by the defendant, his assistant, and attendant nurses, with charts indicating his temperature from day to day, which shows that no malignant or dangerous indications appeared until three or four days before the death of the patient; also that from the time when intestate came to the hospital until very near the end his wound was thoroughly cleansed and properly dressed at suitable times with reference to the sanitary and antiseptic requirements now recognized by the highest standards of the medical profession; and that, while the progress of recovery was slow, it was apparently continuous,—the second amputation being required not from any suspicion of blood poisoning, but to secure a better stump as the ultimate result of the treatment.

While it is not necessary to give in detail the clinical history of intestate's disease, yet, in view of the distinctive charge of defendant's negligence in failing to discover the existence of septicæmia in his patient, it is sufficient to say that it was emphatically insisted by the defendant himself, his assistant, and the nurses, that no evidence thereof was discoverable, and that there was no pus or poisonous exhalation from the wound, which would be the essential danger signal in a case of blood poisoning. In these respects the defendant did more than to rely on the presumption in his favor, and it is not apparent that there was an attempt to suppress any evidence of the course of intestate's treatment while under his charge; but, since the facts were not submitted to the jury, it becomes necessary to sublimate from the plaintiff's own proofs the specific grievance of which she complains. This rests upon her testimony that within four or five days after her husband was brought to the hospital purulent discharges of a poisonous

character issued from the wound, and continued to exude therefrom until his death. She states that during many times on her visits to her husband she discovered pus coming from the wound. Another witness also says that he saw pus flowing therefrom, and on the bandages. But neither claim professional or expert knowledge, which would enable them to distinguish a poisonous from a healthy discharge, if such distinction were necessary.

During the progress of the treatment there was a continued effort made by the defendant and his assistants to secure the ultimate healing of the wound. That this course was proper without some distinctive ground of suspicion of blood poisoning is evident, but it must be also conceded in favor of plaintiff's theory that, if poisonous matter came from the wound, it was evidence of septicæmia, and that proper drainage should have been established to carry the poison out of the system; hence the very pith of plaintiff's claim is and must be that in closing up the wound at an early stage of the treatment, and by keeping it closed afterwards, the flow of the poison germs was retarded, which caused death. So that the issue at the trial was whether the defendant, by the exercise of reasonable care, could have discovered the existence of septicæmia from the effusion of poisonous pus from the wound, and by closing it up, although to secure the more rapid healing of the stump, he was guilty of malpractice.

The statement of plaintiff that the exhalations from the wound were pus must not, however, be unqualifiedly accepted. Dr. W. H. Stone, an expert having the proper qualifications, was the witness presented to sustain plaintiff's theory in this respect, and, basing his opinion upon her testimony and other evidence to the effect that pus continued to exude from the wound from the beginning until the end, stated that the closing up of the wound was improper; but in connection with his statements in this respect he stated also that upon the conceded facts such a discharge of pus would be unusual. He further stated that there is a healthy discharge from all wounds of a watery matter or serum that may be easily mistaken by the nonprofessional observer for the poisonous discharge indicative of septicæmia. He also stated that the discharge characterized by plaintiff as pus would be accompanied by

certain other evidences of septicæmia, which for several months during the treatment concededly did not exist in this case. The testimony of Dr. Stone was based upon a partial account of the clinical treatment of intestate. The assistant and nurses afterwards gave a more full and detailed account thereof, and six reputable physicians of the highest standing and character in the profession, basing their opinion on a complete description of the entire treatment, were of the opinion that Dr. Courtney's course was proper, and that the exhalations from the wound were not of a poisonous character.

Leaving out of consideration any other evidence in this case than that of Mrs. Martin and her own expert, we cannot say that the testimony reasonably tended to support the view that the emissions from the wound were poisonous, or appeared to be of a sufficiently dangerous nature to have required defendant to stop his efforts to heal the wound, and devote his attention solely to a better drainage for fear of blood poisoning. Neither can we hold that the jury had a right to say that a different course should have been adopted upon a supposition that plaintiff's characterizations of the wound discharges were accurate where a nonprofessional judgment would be wholly insufficient for that purpose. In such cases a nonprofessional observer is not to be permitted to diagnose disease, nor define its symptoms, as the basis of judgment. Counsel recognized this elementary rule in the production of Dr. Stone, but the wisdom of the rule we have stated is obvious. The professional assistance of the physician is sought upon the supposition that he has superior knowledge, derived from his art, over a nonprofessional person; otherwise why call him? To this the patient submits himself. Hence the knowledge of the physician must also necessarily be distinguished from the knowledge or judgment of the ordinary layman, and constitute the standard by which any course of medical treatment is to be measured and determined. It is true that during the later stages of the disease Mrs. Martin claims there was exterior inflammation of the skin of the leg below the knee, but upon her distinct characterization of pus exhalations the opinion of her own expert that defendant's treatment was improper must depend, and this was at least but

an unprofessional surmise on her part. It could be nothing more in fact than a conjecture whether the discharges from the wound were of a poisonous nature, or such as had been described by Dr. Courtney and his assistants; and mere conjecture or supposition should not be sufficient to overcome the presumption in favor of the attending physician.

Where the submission of important facts necessary to sustain a verdict rests on conjecture or suspicion alone, it should not be said in any enlightened tribunal that it could reasonably sustain a verdict. "Mere possibilities can never establish the probability of a fact requisite to be proved in order to make * * * a party liable in any action whatever. To decide otherwise would be to say that verdicts may rest on mere possibility, speculation, and conjecture." Minneapolis S. & D. Co. v. Great Northern Ry. Co., 83 Minn. 370, 376, 86 N. W. 451; Swenson v. Erlandson, 86 Minn. 263, 90 N. W. 534. Hence we conclude that the conclusion of the trial court that it would have been its duty to have set aside any verdict for the plaintiff based upon this record as a matter of law, and not in the exercise of its discretion, was correct.

On the former trial plaintiff presented her claim for recovery upon the ground that the second amputation, of September 16, should have been made higher up, instead of at the place it was made, and also that proper dressing and bandages were not applied to the wound. Her contention is now radically different. On the former trial, as appears from the evidence, she was not able to state, although she assumed to give a description of the wound from time to time, that any pus exuded therefrom, nor was she able to describe the character of the discharges therefrom, but stated that she did not know what they were. While the testimony for Dr. Courtney from experts who testified in his behalf— among them several of the best practitioners in the state—is such as to have convincing weight in exonerating him from any misconduct, and is of great persuasive force in our judgment; yet our respect for the province of the jury in such cases would have led us to the conclusion that we should order another trial but for the statements of Dr. Stone, which, as a whole, are entirely in accord with all the other testimony upon the subject to the effect

that the germs of septicæmia were not discoverable until any remedy therefor was too late to be of avail in saving the life of intestate. .

Order of the trial court affirmed.

LEWIS, J. (dissenting).

I dissent. From a careful reading of the record, I cannot avoid the conclusion that the case should have been submitted to the jury.

BROWN, J. (dissenting).

I dissent. In my opinion the evidence was, as we held when the case was last before us, sufficient to take the case to the jury, and the order appealed from should be reversed.