BETTYE P. BOOTH, APPELLEE, v. FREDERICK M. ANDRUS, APPELLANT.

FILED SEPTEMBER 28, 1912.   No. 16,630.

1. **Physicians and Surgeons:** MALPRACTICE. In an action for malpractice, a physician or surgeon is entitled to have his treatment of a patient tested by the rules and general course of practice of the school of medicine to which he belongs.

2. ———: SKILL REQUIRED. Physicians and surgeons are not required to possess the highest knowledge or experience, but the test is the degree of skill and diligence which other physicians in the same general neighborhood and in the same general line of practice ordinarily have and practice.

3. ———: ———. Physicians and surgeons do not impliedly warrant the recovery of their patients, and are not liable on account of any failure in that respect, unless through some default of their own duty.

4. ———: Malpractice: Trial: Examination of the Person. Where during the trial of an action against a surgeon for damages for malpractice, the plaintiff voluntarily submits a portion of her body to the inspection of the court and jury, it is error for the court to refuse to permit an examination, by a limited number of reputable surgeons of defendant's selection and school, of that portion of the body so exhibited.

5. ———: ———: ———: ———. And where, in such an action, the claim is single, and is based upon two separate operations on the same day, upon two different portions of plaintiff's body, if plaintiff voluntarily submits to the inspection of the court and jury that portion of her body upon which one of such operations was performed, it is error for the court to refuse to permit an examination, by a limited number of reputable surgeons of defendant's selection and school, of the other portion of the body upon which the other operation was performed.

6. ———: ———: Admission of Evidence. In an action for damages against a surgeon for malpractice, where the allegations and prayer of the petition are based solely upon the defendant's alleged negligence and want of care in the performance of certain surgical operations and in the administration of medicines in connection therewith, at plaintiff's home and in defendant's hospital, it is prejudicial error for the court to permit plaintiff to testify that, at another time and place, during the several months interim between such operations, defendant made an indecent proposal to her.

7. Instructions examined and referred to in the opinion, *held* erroneous.

8. Appeal: Reversal. Where the preponderance of the evidence against the verdict of the jury is so great as to indicate that the verdict was probably the result of passion or prejudice, it will be set aside and a new trial ordered.

9. Evidence examined and set out in the opinion, *held* insufficient to sustain the verdict and judgment.

Appeal from the district court for Lancaster county: Willard E. Stewart, Judge. *Reversed.*

C. C. Marlay, L. C. Burr, B. F. Good and S. A. Wood, for appellant.

T. J. Doyle and G. L. De Lacy, contra.

FAWCETT, J.

During the period of time covered by the petition, plaintiff was a married woman living with her husband and defendant was a practicing physician and surgeon of the eclectic school. Defendant was first called to see plaintiff professionally in April or May, 1907, and continued to treat her from that time until September, 1908, at which time his ministrations ceased, and shortly thereafter this action was begun in the district court for Lancaster county, to recover damages for alleged malpractice on the part of defendant in his treatment of plaintiff during the time above indicated. The jury returned a verdict in favor of plaintiff for $7,200, upon which judgment was entered, and defendant appeals.

The substantial averments of the petition are:

1. That in the month of July, 1907, defendant carelessly and negligently, and without the knowledge and consent of plaintiff, produced an abortion of a living fœtus, and thereafter removed plaintiff from her home to a hospital owned and operated by defendant, "and there put the plaintiff under the influence of an anesthetic and curetted the plaintiff, subjecting her to great indignities and great pain, and further lacerated and injured the plaintiff."

2. That about February 14, 1908, defendant advised plaintiff that a surgical operation was necessary, to shorten certain ligaments, and also suggested that he desired to remove plaintiff's ovaries; the latter of which plaintiff forbade; that the ovaries were not diseased, and it was not necessary to remove the same; that, notwithstanding such fact, defendant performed said operation, and did so in such an unskilful manner that plaintiff was unnecessarily lacerated and mutilated; that an anesthetic was administered to plaintiff by defendant; that no physician was called in to aid or assist in administering the anesthetic or in performing the operation; that while plaintiff was unconscious defendant, without her knowledge or consent, removed her appendix, cut and lacerated the

ligaments, and removed one of the ovaries, all of which was entirely unnecessary, thereby greatly impairing and permanently injuring the health of plaintiff.

3. That during treatment of plaintiff defendant prescribed and used powerful and poisonous and deadly substances, known as H. M. C. tablets No. 1, and H. M. C. tablets No. 11, containing morphine, hyoscine, and other deadly poisons, and provided a hypodermic syringe, with which said poisons were injected into the system of plaintiff, thereby tainting her blood with said poisons, causing irritations and eruption upon the skin which was superinduced solely by said treatment and the use of said poisons, causing constant, permanent and "most powerful" irritation.

4. That on or about May 11, 1908, defendant advised plaintiff that it would be necessary to perform a further operation to adjust the ligaments already referred to, and that it would be necessary to put her under the influence of an anesthetic for that purpose; that plaintiff again gave imperative instructions not to remove the remaining ovary; that the same was not diseased and it was not necessary to remove it; but, notwithstanding this fact, after plaintiff was placed under the influence of an anesthetic, her body was again mutilated by making an incision therein without her knowledge or consent, and the remaining ovary removed; that the Fallopian tube of plaintiff was also removed; that the operation was done in a careless, unsurgeonlike manner, and was entirely unnecessary; that it left plaintiff a complete physical and nervous wreck; that the use of the poisonous drugs above referred to was continued; that plaintiff was compelled by defendant to use the same and was told that she would die if she did not do so; "all of which was entirely unnecessary and highly injurious to the constitution and health of the plaintiff, and this plaintiff by the malpractice of defendant in the manner aforesaid was brought to such a state of acute suffering that defendant attempted to keep plaintiff in a state of unconsciousness continu-

ously by the use of said opiates and poisons, which further wrecked and weakened her system and rendered her intensely nervous, and said germs of poison were injected into the system of plaintiff by defendant, and she was so impregnated therewith that the same continuously manifested itself in eruptions of the skin."

5. That prior to said assault "made upon plaintiff in the manner aforesaid by defendant" the general health of plaintiff was good; her constitution strong and unimpaired; plaintiff was then 32 years of age, a married woman with prospect of a long life, and the blessings and comforts and happiness of home and of rearing a family; that the assault and injury of the defendant "in the manner aforesaid" has rendered it impossible for plaintiff to conceive and to rear children, rendered her a constant and permanent sufferer, and that said injuries inflicted are permanent; that plaintiff has expended large sums of money in treatment and effort to cure the injuries inflicted upon her by defendant, in the manner aforesaid, in the sum of $1,000, all of which has been necessary; that she has been compelled to live away from the presence and companionship of her only child and to be constantly separated from her husband on account of the condition of health thus inflicted upon her by defendant, and for the reason of the premises has sustained damages in the sum of $50,000, for which amount she prayed judgment. Later, as an amendment to the petition, it was alleged that at the operation of May 11, above set out, defendant also made an incision in the plaintiff's body, extending from the lower part of the shoulder of the right side near the breast and continuing from there down around the breast, a distance of about seven inches; "cut and lacerated the plaintiff without her knowledge or consent, under the pretext that the glands of the breast were affected with tuberculosis and it was necessary to remove the same, and greatly irritated that said part of plaintiff's body by the cutting aforesaid, and did then put 22 stitches in said opening, and did said act in a careless and negligent man-

ner, in this, that he did not use antiseptics, and by reason of the uncleanliness of said operation in not using proper antiseptic and clean and sterilized instruments, and in not having the hands in the proper cleanly condition, and in performing said operation when it was entirely unnecessary, the said plaintiff having no tubercular glands. thereby caused an eruption of the skin and septicemia and a poisoned condition of the blood, causing the right side of the breast of plaintiff, arm and leg on right side to be constantly sore and affected with an eruption which is incurable and constant and very painful."

Defendant filed a motion to make the petition more definite and certain in certain particulars, one paragraph of which was directed against the allegation in the second paragraph of plaintiff's petition—"subjecting her to great indignities." This motion was overruled. Defendant also filed a motion to strike from the petition the words, "great indignities," which was also overruled. Thereupon defendant answered, first, denying generally all allegations not specifically admitted; and then alleging that when called upon to treat plaintiff he found her suffering very severe ovarian and uterine pains at her monthly periods; that he gave her the necessary and proper treatment required in such cases; gave her the best care and skill in such treatment, and in nowise omitted or neglected his duties or care towards her in any respect; that both plaintiff and her husband advised with the defendant and with other physicians and surgeons as to the condition of plaintiff's health, constitution and physical condition, and as to the operations to be performed upon her by defendant to relieve her and to restore her health, and both plaintiff and her husband, in all the treatments given plaintiff and in all the operations performed upon her by defendant and at the operations in February and May, 1908, consulted, advised with and directed defendant to use, and he did use, the best and greatest care, endeavor, judgment, skill and discretion, "save and except that said plaintiff stated several times to defendant that she did

not wish her ovaries to be removed except as a last resort, but nevertheless would leave that question to the judgment and discretion of defendant, and she wished defendant to save them or one of them, if possible, and defendant alleges that said ovaries and Fallopian tubes were in a dangerously unsound and unhealthy condition and the appendix was dangerously unhealthy and unsound and so badly affected that he found it necessary to remove and he did remove one of the ovaries, the appendix and a portion of one of the Fallopian tubes, all the same being approved and advised by other attending physicians;" denies the allegations contained in paragraph 4 of the petition; and alleges that plaintiff was not in general good health, nor was her constitution strong and unimpaired as therein alleged; "that for a long time prior to the event alleged in said amended petition, and during all the time alleged therein, she had consulted and been treated by defendant and many other physicians and surgeons in regard to the same, and so informed the defendant;" and alleges that in all of his services and treatment of the plaintiff he used the best care, skill, services and endeavor to cure and restore plaintiff to good health, and in nowise omitted his duties or care towards her in any respect thereto. The reply is a general denial.

Prior to the alleged abortion in July, 1907, the history of plaintiff's physical condition is substantially as follows: In 1895, the year prior to her marriage, her health was in a precarious condition, causing her to fear that she was going into consumption. She was carried from the house to a carriage and from the carriage to a train and taken to Wyoming, in hopes that change of climate might be beneficial. At that time she was having hemorrhages, the cause of which is unknown, but they evidently led to the fear above suggested. Her health having improved, in 1896 she was married. When her first child was born she had convulsions of so severe a character that her attending physicians advised against her having any more children. When her second child was born she again

suffered from convulsions, apparently not quite so severe as those experienced at the time of the birth of the first child. The second child, when born, was so imperfect physically that "it could not live." It died in three or four days. For some time previous to July, 1907, her menstruation, at the time of her monthly periods, was imperfect and unnatural. She was afflicted with what is termed vicarious menstruation. She would menstruate partly through the mouth, instead of in the natural and normal way. During the month just prior to the time of the alleged abortion she visted St. Paul, Nebraska, where she had formerly lived and had been treated by Doctor Nicholson. While there she was again treated by this physician. He was introduced as a witness for plaintiff, and testified that when she came to his office at that time she complained "of different symptoms, and, as I remember them, one was scanty menstruation." He made an examination of her at that time, using a speculum for that purpose. He testified: "As I found an unhealthy condition at the mouth of the uterus, I, after cleaning it off carefully, I used an iodine solution with a swab, swab with an iodine solution on it, painting the mouth of the uterus." He also testified that he found the womb in an unhealthy and congested condition, and described in detail his treatment. He further testified that vicarious menstruation is an abnormal condition—a rare disease; that "the average practitioner might go through life and not see one;" that in such a case he would look for the patient to probably become anæmic and run down in health. It was within a few days, or at most a week or two, after this treatment of plaintiff by Doctor Nicholson, under the conditions above described, that plaintiff claims defendant produced the abortion. Her testimony is that she was suffering great pain and the defendant was called; that he remained with her substantially all night, treating her from time to time; that during the night he inserted a dilator into the mouth of the womb and prescribed ergot as a medicine. The doctor denies having used a dilator

55

or any instrument other than a speculum, and also denies having prescribed ergot. His testimony is that when he was called he found her suffering great pain, and after propounding the ordinary questions that a physician would ask as to what she thought the trouble was, and after having made a thorough examination of the condition of the abdomen as to pain in the stomach, as to whether or not she had vomited and as to whether or not she had had menstruation previously, and as to what she thought was the cause of her condition, "she told me that she had had a great number of attacks of this kind at her monthly periods and thought it was due to her menstrual period at this time." He was asked: "Was there any reason or cause, in your opinion and judgment as a physician, that an abortion ought to be committed? A. I had no knowledge of the pregnancy previous to this time, therefore I had no right to conclude that an abortion could be produced." He further testified that the substance which was subsequently ejected was not an ordinary fœtus, or child, but was what is termed a mole. He fully described to the court and jury the cause and character of a mole, and testified that where there is this deformity in growth the authorities state, and his own knowledge of cases of that kind is, that at about the fourth or sixth month these foreign bodies are removed by nature. He testified that he described the mass which had been ejected the moment he saw it, designating it to the plaintiff as a "large tumor." He also testified to having opened it, and that "there was no child of any description in this mass." The testimony of Doctor Nicholson and of the defendant, as well as that of plaintiff herself, negatives the idea that defendant on that occasion would have any reason to suspect that plaintiff was pregnant, or that the thought of producing an abortion could have been in his mind at the time he was treating her. Plaintiff now claims that she was about four and one-half months advanced in pregnancy. Each of the four months during her alleged pregnancy she had had her monthly period to a

certain extent. During those times she suffered pain and had scanty menstruation. Her own thought, when she went to Doctor Nicholson and when she called defendant, unquestionably was that she was not pregnant, but that she needed something to relieve the defective menstruation. That is what she told Doctor Nicholson and that is what she told the defendant. Moreover, according to her own statement, if in that condition she did not desire an abortion. She did not request one, nor was one even suggested by the physician. She was a married woman living with her husband, and there was no reason why the defendant should commit a crime by performing this unnecessary act. We think the evidence is insufficient to sustain this charge.

The allegations of the petition and the substance of plaintiff's testimony are that at the time defendant performed the first operation, in February, 1908, no other physician was called in to assist in administering the anesthetic and in performing the operation, and that defendant then removed one of plaintiff's ovaries. Upon both of these points plaintiff fails to make out her case. The facts are that Doctor Skinner was present and administered the anesthetic, and that Doctor Werkman was present and assisted in the operation. That either of the ovaries was removed at this time is denied by defendant, and he is sustained by the fact that at the time of the second operation in May following both ovaries were in place. What the defendant did at the time of the February operation was to remove the appendix and treat the ovaries, both of which operations were with the approval of Doctor Werkman who assisted in the operation. The treatment of the ovaries was what has been termed "plastic work," which we understand to be removal of diseased portions of the ovaries, and which in this case consisted of cystic tumors adhering thereto. So far as the record before us shows, everything that was done by defendant at that time met with the approval of Doctor Werkman who was assisting in the operation. There was

nothing from which negligence or unskilful work, so far as the operation was concerned, can be inferred. The next operation was in May following. At that operation Doctor Skinner was again present and administered the anesthetic, while defendant was assisted in the operation by Doctor W. N. Ramey, who has been a practicing physician and surgeon since June, 1893, and by whom plaintiff had been examined prior to the operation, for the purpose of getting his ideas as to whether or not further surgical work was necessary. Defendant and Doctor Ramey both testified that upon opening the abdomen and making an examination they found both ovaries and the Fallopian tubes badly diseased. Defendant testifies that prior to this operation he had talked the matter over with plaintiff and her husband; that plaintiff again refused to consent to the removal of both ovaries, even though an examination should disclose that they were badly diseased, but that she consented to the removal of one, if it should be found necessary. The evidence shows that during this operation defendant and Doctor Ramey discussed the conditions as they found them and that everything that was done met with the approval of both. Doctor Ramey's testimony is that "the conclusion was that the work be done just as the doctor did it. It was necessary for the welfare of the patient." Doctor Ramey also testified as follows: "Q. Was there anything that was left undone that ought to be done? A. I would say that, according to my judgment, there was. Q. What was it? A. Had I been doing the work, I should have wanted to remove the right ovary in the same manner that we did the left one, and I so stated to the doctor. Q. At the time of the operation? A. Yes, sir." The defendant testified that at that time they removed the left ovary, but that as to the right ovary he removed the cysts which had formed, taking out the portion of the pedicel by which the cysts were fastened. "These were removed from the right ovary and the remainder of the ovary left on the right side, which she has at the present time unless it has been removed

since." If this testimony by defendant were not true it would have been a very easy matter to have shown its falsity, as an examination of the plaintiff would have disclosed whether or not she still retained her right ovary. The operation upon the right breast, which was done at the same time last above referred to, is testified to by both the defendant and Doctor Ramey. Their testimony shows that there were two nodules or tumors in the outer and under surface of the breast removed, also some enlarged glands; one nodule, as stated by Doctor Ramey, being as large as a medium hen's egg, and the other somewhat smaller. Defendant gives the size of these nodules or tumors as somewhat larger than that stated by Doctor Ramey. Dr. Ramey states that the growth was a foreign substance. He also testifies that he and defendant talked about them when they found them, and what ought to be done with them, and says: "And, if I remember correctly, I counseled even more radical work than the doctor did on that breast. Q. Were they of such growth and substance that it was necessary to remove them? A. Yes; I so considered it, beyond a question." The testimony of these doctors is corroborated in many particulars by Mrs. Andrus and Miss Heers, both of whom are experienced nurses. That each operation was deemed necessary by defendant and at least one other experienced surgon, and that each operation was properly performed, is established by what we consider clear and convincing testimony, and we do not see how any right of action can be based upon the operations themselves.

This brings us to the question as to whether there was any negligence on the part of defendant in the treatment of plaintiff after these several operations. That the last incision in the abdomen and the one in the right breast did not perfectly heal after the operations was established. The cause for their failure to heal has not been established, by any testimony outside of plaintiff herself, and her testimony with reference thereto is very unsatisfactory. Whether the failure of the wound to heal was

the result of plaintiff's diseased condition or from outside infection can only be conjectured. Mrs. Andrus and Miss Heers, the nurses, testified that after the operation plaintiff would put her hand under the bandages and raise them up so as to look at the wound; that they admonished her that she must not do that, but, heedless of their admonition, she repeated the performance at other times; and Mrs. Lee, a patient in the hospital, who had also been operated upon, testified that plaintiff showed her one of the wounds; that "she drew the bandage back upon her breast, and drew it back aways, and called me in to look at it. * * * I told her right away I did not care to look at it, or something to that effect, and she wanted me to touch it, and I did not and I would not. And I told her she better leave it alone. Q. Did she touch it herself? A. Once she did. She was feeling over it with her hand and I went and called the nurse. Q. Did she remove the bandage from the wound? A. Well, she had it pushed back. Q. How far off of the wound did she push it? A. Well, I should judge I could see two or three inches of it. Q. Showed you the raw wound? A. Yes, sir." She testified that this was less than a week after the operation. This testimony was all contradicted by plaintiff, and it may be said that it therefore raised a question of fact for the jury. Under ordinary circumstances this would be true, but we do not think that the naked testimony of the plaintiff should be permitted to prevail over that of surgeons of years of experience both in the practice of their profession and as instructors in a medical college, and over the testimony of two nurses, and a disinterested patient in the hospital. If the condition of plaintiff is the result of infection from without, it cannot, so far as the evidence discloses, be ascribed to improper dressing and bandaging of these wounds. No witness has testified that they were either improperly dressed or bandaged. No witness has testified that the bandages slipped off or became loose, so as to expose the wounds to infection, while three witnesses have testified

to acts of the plaintiff which may have caused the very infection of which she now complains. Considering the whole testimony, we think there is far more reason to suspect that the failure of plaintiff to make a full and speedy recovery, and the sores upon her person, are the result of her own inherent diseased condition, or of her own disobedient exposure of her wounds.

While plaintiff was upon the witness stand, her counsel had her leave the witness stand and recline upon the counsel table, and, with the assistance of a nurse, arrange herself on the table so as to exhibit her right breast and her right leg from the hip to the ankle. The jury were then permitted to leave the jury box and pass around the table to view the portions of plaintiff's body exposed. When this had been done, counsel for defendant requested that Doctor Wilmeth, whom he had with him in the court-room to assist him in medical examination, be permitted to examine the right leg and right breast of plaintiff. To this counsel for plaintiff objected, but finally permitted the doctor to make some examination of these parts. Counsel for defendant also requested that Doctors Ramey and Wilmeth be permitted to examine the other breast, "and in order to have a full understanding of this they would have to examine the abdomen of this plaintiff also." This was objected to upon the ground that, if they desired to make an application, they should have made it before entering upon the trial. It was insisted by counsel for defendant that, as a part of the matter had been gone into by plaintiff by the exhibition of a portion of her person, defendant was entitled to go into the whole of the question and examine plaintiff both as to the operation in the breast and that in the abdomen; that plaintiff could not consent to let them examine her limb and say that they could not examine anything further, and cited section 339 of the code. While this discussion was going on, plaintiff got off the table and resumed her place on the witness stand. Upon being denied the right of examination requested, defendant requested that he himself be

permitted to examine the left breast and abdomen as part of the transaction that transpired in the courtroom, and counsel for defendant stated that they desired to complete that examination as a part of the cross-examination. The hour for adjournment having arrived, the court withheld its ruling, and on the next day sustained the objection to the application by defendant to make such examination. The court also denied the request of defendant to appoint physicians and surgeons of the same school as defendant to examine the same parts which had been introduced in evidence by plaintiff, counsel limiting his request to the parts that had been exhibited to the jury. The request for permission to examine "the other breast" was clearly gratuitous. It was in no manner involved in the action. It had never been operated upon or treated by defendant, and no part of plaintiff's claim was based thereon. The fact that plaintiff voluntarily exhibited certain parts of her body, involved in the action, did not give defendant a right to examine other parts, not involved. That part of defendant's request was, therefore, very properly denied; but, in denying the other parts of the request, we think the court erred.

Counsel for plaintiff seek to justify the ruling of the court, under our holdings in *Sioux City & P. R. Co. v. Finlayson*, 16 Neb. 578; *Stuart v. Havens*, 17 Neb. 211, and *City of Chadron v. Glover*, 43 Neb. 732. In the *Finlayson* case the holding in the syllabus is: "It is not error for the court during the progress of a trial to refuse to order the plaintiff, who sues for injuries to his person, to submit to an examination of his person by physicians who are witnesses for the defendant, in the absence of any showing whatever that justice would be promoted thereby, and especially so when the plaintiff submits to an examination by such witnesses in the presence of the jury." From the opinion (p. 589) we learn that the request for an examination was made in the midst of the trial; that "the record shows that, when the witnesses on the part of the defense were placed upon the stand to testify upon

the question of the alleged injury, the defendant in error was asked to 'step forward and allow the witness to examine him,' which he did. The record further shows that the defendant in error was 'asked to remove his coat and vest, which he does, and the witness examines the back, sides, and other portions of the body of the plaintiff; also as to his breathing; also the condition of the eyes, the muscles of the leg, the condition of the tongue and of the pulse.' From this it must seem that, even if the court had erred by its refusal to make the order, that error was cured by the examination made by consent of defendant in error." In the *Stuart* case we held simply that, "if a personal examination is desired, the application should be made before the trial begins and experts agreed upon by the parties or appointed by the court." In the *Glover* case, in the fifth paragraph of the syllabus, it is held: "Whether it is proper in an action for personal injuries for the court to appoint, on the application of the defendant, a commission of physicians to make a physical examination of the plaintiff, *quære*. If such action is proper, the application must be made before the trial commences." In the opinion it is said: "It has been twice intimated that it is within the power of the court to make such an order. *Sioux City & P. R. Co. v. Finlayson,* 16 Neb. 578; *Ellsworth v. City of Fairbury,* 41 Neb. 881. In each case, however, the court disclaimed the intention of deciding the question. It was not necessary in either of those cases and it is not necessary here."

We think the same is true of this case. The question here is not whether it is error for the court, during the progress of a trial, to refuse to appoint a commission to examine the plaintiff. The question is, did the court err in refusing to permit the defendant, either in person or by other physicians whom he had in court, to make further examination of the portions of plaintiff's body which she had voluntarily exhibited, and to examine the wound in the abdomen caused by the incision made at the time of the second operation. Up to the time that plaintiff

voluntarily made her body an exhibit, the cases relied upon by plaintiff might apply, but, when she saw fit to introduce her body as an exhibit in this controversy, we think defendant had a right to examine and submit to the jury, if he saw fit, any other part of that exhibit, involved in the action. Defendant had been charged with negligence in the performance of both operations—that upon the right breast and that upon the abdomen. It had been charged that, as a result of these operations and the treatment in connection therewith, plaintiff's health had been permanently injured and she had become afflicted with sores upon her right breast and hip and leg; and, when plaintiff introduced her body as an exhibit, she thereby waived the immunity from exposure of her person, to which some courts have held that all persons are entitled. Section 339 of the code provides: "When part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; thus, when a letter is read, all other letters on the same subject between the same parties may be given. And when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence." The several operations performed by defendant form the basis of plaintiff's claim of injury. Her claim, therefore, is based upon detached acts, one upon the breast, the other upon the abdomen, but both upon the same body; and, when that body was introduced in evidence for the purpose of showing to the jury one of those detached acts, the defendant had a right to examine and give in evidence the other.

In *Winner v. Lathrop,* 22 N. Y. Supp. 516, it is said: "I have been referred to no case, nor have I been able to find any, in which a party claiming a physical injury has first voluntarily submitted the injured part to the inspection of the jury as evidence, and has refused to permit the adverse party to follow up that examination,

in the presence of the jury, by a personal or professional inspection of such injured part. Such an examination, seems to me, to stand upon a different principle from that of a compulsory examination by the adverse party, before or at the trial, when the injured party has not made profert of the injured part. It seems to me that it would be unfair, and might result in gross injustice to the party against whom such evidence was used. In such a case it would be in the power of the party, by muscular distortion of the injured part, especially an arm or hand, to impose upon the jury and court, as well as the adverse party, and produce upon the mind of the jury a false impression as to the extent of the injury. The member having been put in evidence as a part of the direct examination, it is, for the purposes of the trial, made the property of the court and opposite party for the purpose of a cross-examination. It is difficult to conceive of a specie of evidence that is offered by one party, in support of his case, which may not, in the presence of the same tribunal, be examined and criticized by the party against whom it is offered. We think, therefore, that the inspection and examination of this limb should have been ordered and permitted by the court; and, in case of refusal to submit to such inspection by the plaintiff, her evidence, so far as that exhibit and explanation of the same by the plaintiff was concerned, should have been stricken out on defendant's motion. The plaintiff had a right to exhibit this injured limb to the jury, and the defendant had no power to exclude it. * * * If the party injured can offer this evidence, most certainly the adverse party should be permitted to cross-examine and criticize such evidence. For both the grounds above discussed, we think that this judgment and order should be reversed."

In *Haynes v. Trenton,* 123 Mo. 326, 336, it is said: "The leg, when shown to the jury, became evidence in the case which may have carried with it great weight, particularly in the matter of the damage sustained. This evidence thus put into the case was open to attack by the

opposite party in any manner which may have tended to reduce its probative force. When, for example, a piece of machinery or material, the character or quality of which is in issue, is exhibited to the jury, it is always competent for the opposite party to have experts examine it and give the jury their opinion of the quality of the material and the sufficiency of the machinery. When admitted in evidence, and its damaging effect has been accomplished, it cannot be withdrawn until the party affected by it has had opportunity to apply every test for the purpose of overcoming its force and effect. No reason can be urged why a different rule should be applied when an injured limb is the subject of inquiry. Defendant had the undoubted right in this case, at any time after the injuries had been shown to the jury, to have physicians examine the injured leg and testify, as experts, to its character and probable permanency. The question was not as to the right of defendant to have an examination of the injuries made, but as to the right to test the effect and reduce the weight of evidence introduced by plaintiff." And so in this case the question was not simply as to the right of defendant to have an examination of the person of the plaintiff, but as to his right, as stated by the Missouri court, to have the body, which had been introduced as an exhibit, examined by experts to test the effect and reduce the weight of evidence presented to the jury by the introduction of such exhibit.

In *Chicago, R. I. & T. R. Co. v. Langston,* 19 Tex. Civ. App. 568, the court say: "As this was the single specific ground of objection urged to their making an examination of the injured limbs, preparatory to giving an opinion, we come to the question, seeing that the ruling was probably prejudicial, whether the court erred in denying appellant's request for such preliminary examination. If appellee had not made profert of her injured limbs to the court and jury, the request to have experts appointed by the court to make an examination over her objection would present the question which has been repeatedly before the courts,

and upon which the decisions are in hopeless conflict, so much so that judges of the same court, notably of the supreme court of the United States, are divided in opinion upon it. For the two opposing lines of argument, see the majority and minority opinions in *Union P. R. Co. v. Botsford,* 141 U. S., 250. This court, and presumptively our supreme court, stands committed to the views expressed by the majority of the court in the *Botsford* case. *Gulf, C. & S. F. R. Co. v. Pendery,* 14 Tex. Civ. App. 60, in which writ of error was refused. But inasmuch as appellee invited an inspection and examination of her wounded limbs by making profert of them on the trial, we have finally concluded that the case presents a different question from that so often considered, and that its solution should not be influenced by our cherished Anglo-Saxon principle of personal security. In our opinion, it would be a perversion of that principle to apply it in a case like this, where the plaintiff, unfortunate and pitiable though she be, voluntarily lays bare before the court and jury her afflicted members for the inspection and examination of the judge, jury, and advocate. For all the purposes of the trial, she thus waived her right to object, upon the ground of an invasion of her right of personal security, to a reasonable and proper examination, under the direction of the court, of the wounded parts. She thus by her own voluntary act conferred upon the court jurisdiction to compel what otherwise she might have refused to submit to. Having conferred the jurisdiction, she could not take it away at pleasure without trifling with the court. It lasted as long as the trial lasted." The court then quotes with approval from *Haynes v. Trenton, supra,* and concludes as follows: "So we hold in the case at bar, not that the court should have appointed physicians to make an examination in the first instance, for we have no statute prescribing such procedure, but that when appellant's counsel made the following proposition, as shown in the bill of exceptions, 'Doctor, will you please here and now examine the plain-

tiff and her injuries?' the objection made by appellee's counsel should have been overruled and the witnesses permitted then and there, or at such other reasonable time and place as the court might appoint, to make the proposed examination and give the result of it to the jury. It seems to us that this would have been simple justice, and consequently that it ought to have been done, thereby avoiding the appearance of an *ex parte* trial on this important issue. No harm could have resulted from such a course. Upon this ground, therefore, we feel constrained to order a reversal of the judgment." This case was taken to the supreme court and there affirmed in 92 Tex. 709.

In *Chicago & N. W. R. Co. v. Kendall,* 167 Fed. 62, 71, the circuit court of appeals of our own circuit held: "Where the plaintiff, in an action for an injury to his knee, while on the witness stand voluntarily exhibited the injured knee for inspection by the jury, the defendant is entitled to require him to submit the same to a surgical examination, and the court has power independently of any statute to compel such submission." In the opinion, after considering *Union P. R. Co. v. Botsford, supra,* and other cases, the court say: "In the present case we are not dealing with an application for a surgical examination in advance of the trial. Here the plaintiff at the trial voluntarily exhibited his knee in open court for inspection. Having done this, it was beyond his power to arrest the investigation. The defendant and the court were entitled to employ any agency in its examination which would aid in the determination of the issue on trial. It is universally held that, where an inanimate object is produced upon the trial of a case, it is subject to any legitimate examination and test which will elucidate the matter in dispute. It may be submitted, for example, to chemical treatment, or to examination by the microscope. Simply looking at the plaintiff's knee with the eye of a layman furnished little aid in determining its condition. He himself maintained that there were no external evi-

dences of injury. Whether there were hidden ailments could only be discerned by the skill of a surgeon, and the defendant and the court were as much entitled to turn the eye of a surgeon upon the plaintiff's knee as they would have been to look at a blood stain through a glass. Having exhibited his knee to the jury, it became a part of the evidence in the case, and the mere accident that the thing exhibited was part of a human body could only qualify, and not defeat, the right of complete investigation"—citing *Chicago, R. I. & T. R. Co. v. Langston,* and *Haynes v. Trenton, supra.*

While plaintiff was a witness upon the stand she was permitted to testify that some time in April, 1908, which was something like two months after the first, and about a month prior to the last, operation, defendant brought her to Lincoln to see Doctor Ramey; that he stated that "he was going to be busy that forenoon at the hospital there, and he told me to meet him at the Lincoln hotel and we would have lunch and then go and see Doctor Ramey;" that after luncheon he procured a room and took her to it, and while in the room he insulted her by making an indecent proposal to her. This testimony was strenuously objected to by defendant. The objection should have been sustained. It did not even tend to sustain any averment in plaintiff's petition. The petition clearly and definitely bases plaintiff's claim for damages upon defendant's acts in producing the alleged abortion, in performing the surgical operations and in administering poisonous drugs, and makes no reference whatever to an assault of any other kind. In his brief counsel for appellee says: "On page 56, the court says: 'The indignities, as I understand the petition, are afterwards explained as meaning that the surgical operation was an indignity, and the lacerations and dilations, and that sort of thing, being contrary to direction.' The above statement of the court is the true interpretation of the petition." If those words, which in the statement of the case we have quoted from the second paragraph of the

petition, do not lay a foundation for this testimony, then clearly none was laid. In passing upon the objection the court said: "Had I been able to interpret this petition as laying the foundation for matters of a scandalous character I would have struck it out. The petition does not apprise me of anything of this character to be proved, but I am inclined to admit this testimony, notwithstanding the shape of the pleading. I think the petition should have stated plainly if an incident of this kind was to be proven, that the defendant would know what he was charged with, and that he might have an opportunity to prepare for it at the trial. The petition don't apprise the defendant that this sort of testimony would be offered. However, it is part of the conversations between the plaintiff and defendant, and I am going to overrule this motion and hear the testimony." Here the court gave a clear, clean-cut legal construction of the pleading, but followed it with an erroneous ruling. The testimony offered was entirely foreign to the issues. It could shed no light upon the question as to whether the defendant had skilfully or negligently performed the surgical operations complained of. In fact, from every point of view, it was improper and should have been excluded. That evidence of this character would probably be seriously prejudicial to defendant seems to us is not open to discussion, and we have no doubt but that it was largely responsible for the very liberal verdict of the jury.

Instruction No. 6 defined malpractice as "the bad professional treatment of disease, pregnancy or bodily injury, from reprehensible ignorance or with criminal intent." As an abstract legal proposition, or if based upon pleadings charging "reprehensible ignorance" or "criminal intent," the instruction would be correct, but a trial court has no right to state in its instructions to the jury an abstract legal proposition that is outside of the issues. In this case neither "reprehensible ignorance" nor "criminal intent" is charged. The charge is negligence, and we think the court would have been more accurate if it had told the jury that malpractice within the issues ten-

dered by the pleadings in this case means the negligent performance of the surgical operations set out, or the bad professional treatment of plaintiff immediately preceding or subsequent to the performance of such operations. There was enough in the case already to inflame the average jury without the introduction by the court of the questions of reprehensible ignorance and criminal intent. The court should, therefore, have carefully guarded this important definition in its instructions. The same objection applies to instruction No. 10.

By instruction No. 12 the court told the jury that it was the duty of the plaintiff as a patient to follow the instructions prescribed by the physician and surgeon, and that, "if she did not follow the reasonable instructions of the defendant, then the defendant is not liable for damages resulting from such disregard of her duty." This instruction correctly states the law, but the court followed it with instruction No. 14: "The jury are instructed that, in so far as testimony has been introduced tending to show that the plaintiff did not submit to all of the treatment prescribed by the defendant for her, and recommended in her case, the burden of proof is upon the defendant to show prescriptions were proper and adapted to the end in view." Our understanding of the law always has been that, in an action for damages against a licensed physician or attorney at law, the presumption is that the defendant had performed his duty to the plaintiff; that the lawyer correctly advised his client or the physician correctly prescribed for his patient; and when the contrary is alleged the burden, in every such case, is on the plaintiff to establish his allegation. In such cases, as in all other cases, under our holdings, where the burden of establishing his case is upon the plaintiff, that burden does not shift, but continues throughout the trial. Instruction No. 14 shifted the burden and placed it upon the defendant, and thereby conflicted with instruction No. 12, which properly placed the burden.

Physicians and surgeons do not impliedly warrant the **recovery of their patients, and are not liable on account**

of any failure in that respect, unless through some default of their own duty. They are not required to possess the highest knowledge or experience, but the test is the degree of skill and diligence which other physicians in the same general neighborhood and in the same general line of practice ordinarily have and practice. *Patten v. Wiggin,* 51 Me. 594; *Force v. Gregory,* 63 Conn. 167; *Martin v. Courtney,* 75 Minn. 255. When they accept professional employment they are only bound to exercise such reasonable care and skill which are usually exercised by physicians or surgeons in good standing in the same school of practice. And where any person claims a cause of action for neglect to exercise the required degree of care or skill, the burden is upon him to prove such neglect. *Martin v. Courtney, supra,* the case last cited, was an action for malpractice. In that case, as in this, there was some conflict in the evidence. Upon that point the court say: "If the defendant can be found guilty of malpractice upon the evidence in this case, it would be unsafe for any man to practice medicine or surgery. * * * While, in view of Doctor Gray's testimony, it cannot be said that there was no evidence tending to support the verdict, yet it is so manifestly against the great preponderance of the evidence that it was an abuse of discretion not to grant a new trial, and submit the case to another jury. * * * It is not merely a sum of money, but also the reputation of the defendant as a physician and surgeon, which is involved, and we do not think that he should stand condemned for all time as an incompetent upon the state of the evidence disclosed by the record, without at least submitting the question to one more jury of his countrymen."

For the insufficiency of the evidence, and the errors of law above set out, the judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.

HAMER, J., not sitting.

ROSE, J., dissents.