LEVI L. GETCHELL *vs.* NATHAN B. HILL & another.

April 21, 1875.

Testimony of Experts—Form of Question.—Where the issue is whether the treatment of a broken arm was proper treatment, the court may, in its discretion, as a matter of convenience, permit to be put to a surgeon, who has heard the testimony, the question: "Having heard the testimony in this case, and assuming it to be true, what, in your opinion as a surgeon, was the necessity of this arm remaining in the position described by plaintiff, for the first twelve or thirteen days of the treatment?"

Verdict Set Aside, as Against Evidence.—The sufficiency of certain evidence to sustain the verdict considered, and a new trial ordered.

Action against the defendants, Drs. Hill and Lindley, as partners, to recover damages for alleged malpractice in their treatment of plaintiff's broken arm. At the trial in the district court for Hennepin county, before *Vanderburgh*, J., the plaintiff had a verdict for $4,000. A new trial was refused, and the defendants appealed.

*Cornell & Bradley*, for appellants.

*Merrick & Hale*, for respondent.

GILFILLAN, C. J.[1] This is an action for malpractice as surgeons, in which plaintiff had a verdict. There are exceptions taken to the charge of the court; but as we find it necessary to set aside the verdict, on the ground that the evidence is not sufficient to sustain it, we do not deem it necessary to pass upon those exceptions.

A physician or surgeon is not an insurer that he will effect a cure. He is held to a reasonable amount of diligence and skill, unless he contracts to do more, and is liable only for injuries that result from his neglect to exercise that degree of diligence and skill. It is not expected that he should come up to the highest standard of skill known to the profession; for in this profession, as in others, natural genius and unusual industry, learning and experience, may enable some of its members to attain a pre-eminence that it would be vain to expect in the great majority. Any person claim-

[1] Cornell, J., having been of counsel, did not sit in this case.

ing a cause of action for neglect to employ the degree of diligence and skill required, must prove such neglect, and that the injury or want of cure resulted from it.

The malpractice alleged was in the defendants' treatment of plaintiff's broken arm. On February 9, 1872, the arm was broken by a tree falling against plaintiff. Some thirty hours afterwards the plaintiff employed defendants, who were practising physicians and surgeons, to treat it, and they continued treating it until March 28th, when he discharged them, and employed Dr. Huntington, who treated it till about the last of May, after which time it does not appear that it received any treatment. There were two fractures, a transverse fracture of the ulna, and an oblique fracture of the radius. The ulna formed a perfect union; the radius never formed a perfect bony union, but reunited by a ligamentous union. When first called, the defendants placed splints and bandages, and interosseous compresses on the arm, and left it in a prone position, that is, with the palm down, and kept it in that position for twelve or thirteen days, meantime examining it from time to time, and at the end of that time raised it to a semi-prone position, that is, with the thumb up.

The only suggestion of improper treatment that we can see in the evidence was in leaving the arm, for the first twelve or thirteen days, in this prone position. We understand it to be claimed that leaving the arm in that position, for that length of time, prevented perfect apposition of the parts of the fractured bone, and was the cause of non-union. Whether this was so, or not, is to be shown from the testimony of experts. There may be cases where, the mode of treatment having been shown, the practical common sense of the jury will enable them to determine that the injury or failure of cure is owing to unskilful or negligent treatment. But this is not such a case; it must depend upon the testimony of the professional witnesses. Now, in such a case, the jury must accept and act upon the testimony of the experts as to the character and effect of the treatment, just as, in any

other case, they must accept and act upon the testimony of other witnesses as to facts of a different nature.

There were a large number of surgeons examined as witnesses, five of whom, Drs. Huntington, Hance, Rogers, Simpson and Goodwin, were produced by plaintiff. Of these, Dr. Huntington, speaking, apparently, of the time when he first saw the arm, about March 22nd, says : " I had no idea, at that time, of non-union ; saw nothing wrong in the treatment ;" and afterwards, " I can't tell what effect prone position would have." In another place, he says : " I don't think the bones could be held in close apposition, with hand down." Dr. Hance says, (testifying from having heard the testimony preceding his,) " In my opinion, I saw no reason for placing the arm in that (prone) position. It would be very difficult, under those circumstances, to put the bones in proper apposition, and maintain them there, because, with palm down, the bones are lying across each other, and it is very difficult to maintain the fragments in proper apposition, from the action of certain muscles." He also explains that it is necessary to preserve the space between the radius and ulna, which he says can only be done with the arm lying on the ulna side, or supine, that is, with the palm upward. He also testified that the splints and treatment by defendants, till they turned the arm up, might preserve the bones somewhat in apposition, but not preserve the space between the bones. On being asked whether the treatment for the first twelve or thirteen days was good or bad, he answered only, " The position of the arm was different from what I should place it in." Further on he says : " I think the position of the arm, as kept and retained for twelve or thirteen days, was prejudicial to the union of the bones ;" but he did not explain to what extent it was prejudicial, nor express an opinion that the non-union was owing to it. Although this witness would not say that he thought the treatment for the first twelve or thirteen days was bad surgery, nor that it was the cause of failure to form a definitive union, it is evident that, in his opinion, it was not the

most proper treatment, and that it may, at least, have retarded such union; and if his were the only expert testimony, we could not say but that the case should be left to the jury.

Dr. Rogers testified: "If the arm had been lying prone twelve or thirteen days, and was then turned up, I think it would irritate soft parts, and if any callus had formed, would break it up. If no callus had formed, it would do very little harm, save irritation of soft parts. Don't think any one can tell the effect of handling the arm, as testified to, except he had hold of the arm. The only objection I see to the treatment was the prone position of the arm, and I don't know what the peculiar circumstances of the case were."

Dr. Goodwin testified substantially the same as Dr. Rogers, except that he thinks prone position of the arm would not retard union. The substance of Dr. Simpson's testimony was that leaving the arm prone twelve or thirteen days might retard process of repair. By that time, he would suppose, reducing the fracture would produce a little fresh irritation, and retard healing progress.

No one of these witnesses gives it as his opinion that the treatment was not reasonably skilful and diligent, and neither of them expresses an opinion that the failure to form a definitive union was owing to that treatment. From the testimony of all the surgeons whose attention was called to the subject, it appears that, in such cases, there are various causes for non-union, or retarded union,—such as injury to the soft parts of the bone; the obliquity of the fracture; foreign substances interposing between the fragments; injury to the nutrient artery, or to the periosteum; and in some cases, the bone fails to unite, without any ascertainable cause.

The opinions of the experts sworn for plaintiff, so far as they gave any, were given upon the plaintiff's description of the condition of the arm when defendants were called to attend it, which is not very full. Dr. Hance, the only one

who gives an opinion that the prone position of the arm for the first twelve or thirteen days was prejudicial to the union of the bone, says his opinion is based very largely on the testimony of the plaintiff.

The description given of the arm by the defendants, which is not contradicted at all, is much fuller, and, being the diagnosis of experts, furnishes a more reliable basis for professional opinions than the more meagre description by plaintiff. From their description the arm was very much swollen, and contused, and congested, and in danger of inflammation. That up to the time they placed the arm in a semi-prone position, they could not ascertain the character and location of the fracture of the radius. Dr. Lindley says: "As far as we could tell, we were first impressed with the idea of doing as little to the arm as we could, and we made as much effort as we were justified in doing in replacing the fractured bones by extending the arm. Finding difficulty in assuming the semi-prone position, I was satisfied that the pronator muscle had to be humored, so to express it, pronator quadratus and radii teres being stronger than the supinator muscle, experiencing a difficulty in making or applying pressure enough to overcome the pronator muscles. After satisfying ourselves that we could not make a full adjustment, we made as full as we could."

Their treatment for the twelve or thirteen days seems to have been based on the idea, in order to avoid exciting inflammation, to keep the arm in as comfortable a position as it could be kept in, until the swelling should subside, and to apply, for the purpose of preserving the interosseous space, only such amount of pressure as, in their judgment, it would bear. If, from their description of the arm, there had been no danger of inflammation, no difficulty in ascertaining the character and location of the fracture, no difficulty in assuming the semi-prone position, or in applying pressure enough to overcome the pronator muscles, or in making a full adjustment, it could have been very easily proved by the expert witnesses. As no attempt was made to contradict them

as to the difficulties which they state as in the way of a different mode of treatment, the existence of those difficulties must be taken as established facts.

All the professional witnesses who were examined after a full diagnosis of the arm had been presented, stated unqualifiedly, as their opinions, that the treatment by defendants was good.

Dr. Thayer testified : " Taking Dr. Hill's treatment, as detailed by him, (Dr. Hill's statement was not contradicted,) I regard it good surgery ; some surgeons would place hand further back, some further forward ; either would be correct."

Dr. Murphy testified : " I think Dr. Hill's treatment was very good surgery. Don't think the treatment first ten or twelve days had anything to do with non-union ; rest is what is required."

Dr. A. A. Ames testified : " In my opinion it was good surgery ; there was nothing in the first ten or twelve days' treatment that would hinder the union of the fractured bone ; it might set it back a day or two. With such an arm there would be nothing in the fact that it was not turned up for ten or twelve days ; it would in no respect hinder the union."

Dr. A. E. Ames : " From the testimony of Huntington and others as to the condition of arm, I do not see that its present condition can be attributable to defendants' prior treatment. In first condition of arm, it should be left in most comfortable position, until inflammation subsides."

Dr. Cross : " Have heard testimony as to first ten or twelve days ; deemed it good treatment. I heard nothing that seemed other than good surgery."

Dr. Stone : " Consider the position of the arm, the first ten or twelve days, the only good surgical treatment ; other conditions, besides preserving interosseous space, to be looked to at that stage."

Dr. Evans : " Taking all the testimony in the case, I can see nothing that was done or omitted to be done that would produce the effect that now appears. Assuming that the

testimony is true, I do not think it probable that the present condition of the arm could have arisen from the treatment of the first ten or twelve days."

Dr. Kimball : "I consider treatment of that arm, first ten or twelve days, good ; there is nothing in the treatment all through to produce the present result."

We have here cited only the expression of opinions by these surgeons, without referring to their testimony in detail, or to the reasons which each of them gives for his opinion. When these reasons are considered in connection with certain facts in the case, which do not seem to be questioned, and putting out of view the expressed opinions of the surgeons, it is barely possible, as the evidence stands, that the unfortunate present condition of plaintiff's arm is, in any degree, due to want of skill or care on the part of defendants.

It appears from the testimony of all the surgeons that it is desirable, though not always feasible, to have the parts of the fractured bone in perfect apposition, as soon as the curative process begins, and to retain them thus until a definitive union is effected. It would not seem to be essential to bring them into apposition prior to the commencement of this process, except that, unless it is done, the contraction of certain muscles may render it difficult to do it afterwards. The object of placing the arm, in case of such a fracture, in a semi-prone or supine position, is to place and keep the parts of the bones in apposition. We do not understand any one of the surgeons to say that this should be done before the process of repair begins, in all cases, and without regard to the condition of the arm. The repair of the fracture begins with the throwing out of what is called provisional callus, which is at first soft, and grows harder, till it will hold the bones in place, and what is called definitive callus finally unites the parts. The time within which provisional callus begins to form, varies, depending on the degree of inflammation, and on whether the nutrient artery, or the periosteum, has been injured ; the time being from

six to fourteen days, or even longer. In this case, in which the nutrient artery was injured, the arm was placed in the semi-prone position, so as to bring the parts of the bone in apposition, at the end of twelve or thirteen days. If provisional callus had then begun to form, the turning up of the arm probably broke it up, and so much time was lost as elapsed between the beginning to form the callus, and the turning up of the arm.

From the testimony of Drs. Huntington, Hill and A. A. Ames, it appears that, about March 20th, the bone was in fair apposition, and partially united by provisional callus. After that time, the arm was examined by a number of surgeons, and became,—probably from handling,—loosened. About March 28th, Dr. Huntington took charge of it, and for the first two or three weeks of his treatment, callus seemed to be thrown out, and a tolerably firm union was effected, so that the shaft of the bone seemed to rotate slightly. This condition continued till Dr. Huntington left the case, about May 30th. When he next saw it, the parts of the bone were entirely separate. From the testimony of those surgeons whose attention was called to it, the fact of the apposition and the formation of callus, at the time spoken of, proves that the leaving the arm in a prone position during the first twelve or thirteen days did not prevent either apposition at the proper time, or the throwing out of provisional callus, and this, from the reasons given, seems to be almost certain.

From the entire case, we are satisfied that the jury did not accept and weigh, as they should have done, the testimony of the experts, but must have acted independently of it.

We do not mean to be understood that the jury are to decide the case in favor of the greater number of the opinions of experts; for the opinion of one expert may, from proof of his greater knowledge and experience of the subject, or from his giving fuller details of the case, or more probable reasons for his opinion, be of greater value to the jury than the opposite opinions of several.

After the plaintiff and others had detailed the condition of the arm treated, and mode of treatment, the court permitted certain questions to be asked of the surgeons, which questions were objected to. For the purpose of presenting our views as to the propriety of these questions, we will take only one of them, as a specimen of all. Dr. Hance, who had heard the testimony, was asked: "Having heard the testimony in this case, and assuming it to be true, what, in your opinion as a surgeon, was the necessity of this arm remaining in the position described by plaintiff, for the first twelve or thirteen days of the treatment?" This form of question is not obnoxious to the objection that it calls on the witness to decide any question of fact, for the purpose of basing the opinion on it. It is, in effect, putting to the witness a hypothetical case, which is admitted to be proper. In strictness, the question should state the hypothetical case. We think, however, that the trial court may, in its discretion, as a matter of convenience, permit the hypothesis to be put to the witness, by referring him to the testimony, if he has heard it, instead of requiring the counsel to recapitulate it. *McNaughten's Case*, 1 Carr. & Kir. 139.

The order denying a new trial is reversed, and a new trial granted.