LIZZIE THORKELDSON, AS SPECIAL ADMINISTRATRIX, ETC. v. JOSEPH NICHOLSON.[1]

December 29, 1922.

No. 23,165.

**Evidence in malpractice case weak.**
1. In this, a malpractice case, the evidence that defendant in either diagnosis or treatment failed in his duty as a physician is weak and uncertain.

**Proof of death due to diagnosis or treatment insufficient.**
2. Moreover, there is a total absence of medical testimony tending to prove defendant's diagnosis or treatment caused the death of plaintiff's intestate, and no facts of such a character proved that from them a jury of laymen could infer that decedent would have recovered had defendant diagnosed or treated differently than was done.

After the former appeal reported in 145 Minn. 491, 175 N. W. 1008, the case was tried before McClenahan, J., who directed a ver-

[1] Reported in 191 N. W. 269.

dict in favor of defendant. From an order denying her motion for a new trial, plaintiff appealed. Affirmed.

*M. E. & C. A. Ryan,* for appellant.

*C. D. & R. D. O'Brien,* for respondent.

HOLT, J.

Action for malpractice in which the court directed a verdict for defendant. Plaintiff appeals from the order denying a new trial.

There was a former appeal in this case from an order granting a new trial after a dismissal when plaintiff rested. Thorkeldson v. Nicholson, 145 Minn. 491, 175 N. W. 1008. The same judge presided at both trials below. In the last trial defendant put in his evidence, and the question now is would the court upon the whole record be justified in permitting a verdict for damages to stand? If not, the order should be affirmed.

Defendant, a physician, was called to plaintiff's home in the evening of March 21, 1915, to attend her son Rudolph, 18 years old, who was very ill. Defendant prescribed for him. On his next visit, the following morning, it was determined to remove Rudolph to a hospital in Brainerd conducted by defendant, so that the patient might have better care than could be furnished at his home. This was done on the twenty-third of March. Rudolph did not improve, and plaintiff, the mother, insisted on calling Dr. Reimestad on the eleventh of April. Pus was then found in the pleural cavity and on the thirteenth it was drained. He remained under the care of both doctors until April 26, when the mother became dissatisfied and caused him to be removed to another hospital where he remained under the exclusive care of Dr. Reimestad until death, May 22.

The negligence alleged is that defendant first treated Rudolph for the grippe, then for typhoid fever, then for kidney trouble, when he was not ill from any of said diseases but from empyema, and that defendant negligently failed to operate and treat him for empyema.

The only evidence to support these allegations of negligence is to be found, if at all, in this statement of Dr. Reimstad that defendant refused to believe that empyema was present until pus was dis-

closed by the use of the trocar, on April 11, and upon this improbable testimony of the mother that some days after the boy's funeral, when defendant requested her to pay the balance of the hospital bill, there was a dispute as to its having been paid in which the doctor called her a liar twice, and then she retorted: "Then I asked him if he knew that he had treated Rudolph wrong all during that three weeks he was in the hospital,' I says, 'and the poor fellow,' I says, 'had to go,' I says, 'on account of not getting help in time, what he should have had it. And he stooped his head down and he set for awhile and he kind of looked at me and he says, 'I know,' he says, he didn't treat him right, 'I know,' he says, 'I can be punished, but,' he says, 'it will cost you money and it will cost me, and you will not get the boy back,' he says, 'so let's be friends,' he says." Dr. Reimestad expressed the opinion that empyema might have existed for about two weeks, and that proper treatment was to drain the cavity as soon as pus was suspected. Dr. Jamieson, a medical expert for plaintiff, testified that empyema was not likely to have existed from the beginning of the illness. And in answer to the question, how long it does ordinarily take from the time empyema begins to develop until it may be detected, the witness said: "The time varies, it depends on the resistance of the patient, the condition of the patient. It may take only over night sometimes." The evidence did not give him a basis to form an opinion as to when the empyema started. He further testified that from the mother's description of Rudolph's condition during his illness none but a "snap" diagnosis of the ailment from which he was suffering could be made.

The evidence, taken as a whole, is too uncertain and attenuated to establish that defendant's diagnosis was negligently incorrect, or his treatment faulty from a professional standpoint. A physician is not liable for a mistake of judgment in the making of a diagnosis. There are complications in diseases to which human flesh is often subject that may for days and weeks baffle or set at variance the most skilful diagnosticians. Empyema is a secondary disease. Dr. Reimstad testified it frequently develops from influenza or grippe; from bronchial pneumonia; "that you hardly ever find a typhoid

germ causing influenza, but the symptoms might assimilate;" and that any number of infections will cause kidney trouble. Thus, even adopting the mother's version of defendant's designation of what Rudolph was suffering from, there is no foundation for a finding that there was negligence or want of professional skill in the diagnosis. The same holds good as to care and treatment given.

But, when it comes to causal connection between the alleged negligence and Rudolph's death, there is still more patent absence of proof. This is not a case to recover for suffering endured because of defendant's negligence. There must be proof beyond mere conjecture that the negligence charged caused death. It is not enough that there may be an inference that some negligent act or omission was a contributing cause. In other words, the evidence must warrant the conclusion that Rudolph would not have died from the illness defendant was called in to treat, had he not been guilty of the negligence or want of care alleged against him. People do die, though under the care of the most painstaking and skillful physicians and surgeons. As plaintiff's expert quaintly but no doubt truthfully testified: "The patient will die under the most successful treatment sometimes."

There is another feature of the case which goes far to prove that it is mere guess or conjecture to infer that any act or omission of defendant caused death. From April 11 Dr. Reimestad was in charge of the patient, defendant assisting. After April 26 and for almost 4 weeks until his death, he was taken from defendant's care and observation altogether. There is no opinion whatever from any medical expert that Rudolph could have recovered if defendant had diagnosed or treated him differently than was done.

The learned trial court in an exhaustive memorandum to the order denying a new trial, among other things, says: "The evidence showed that, when Thorkeldson left the care of the defendant he was in a very serious condition, and had been growing worse up to that time, but there is no evidence tending to show that he was then fatally ill, or that his ailment was incurable. In the absence of expert testimony, a layman could have no knowledge, nor indulge in any inference, as to what might thereafter result. After leaving

the defendant's care, and before he was operated upon by Dr. Reimestad and two other physicians, the patient improved, 'he built up so he kind of made a little swing so he was sitting up in bed a little,' according to the testimony of the plaintiff herself.     Just what operation was performed by the three physicians referred to does not appear, nor does the record show what followed, except that the boy died sometime thereafter.    Had death occurred immediately after April 26, with nothing intervening except the removal of the patient, what layman could say that the mere changing of situations, under all the circumstances, may not have produced the fatal result?    But when there is added to this, 26 days of undisclosed occurrences, what reasonable basis can there be for the inference that defendant's negligence was the cause of death?"

This case is not like that of MacIntosh v. Great Northern Ry. Co. 151 Minn. 527, 188 N. W. 551, where inferences may be drawn from physical facts, or malpractice cases where physical conditions are such that common experience may draw inferences as to cause and effect.    Here it seems to us that only medical experts could venture an opinion, and it is doubtful if that could be more than a guess whether Rudolph could have recovered from the illness had defendant properly diagnosed and treated his ailment, even assuming that he received proper medical treatment after he left defendant's care.

When the deficiencies in plaintiff's proof are considered with defendant's evidence as to facts and conditions, the care and attention given to Rudolph at the hospital, which included also unusual consideration for his mother, in that she was permitted to stay with the son at the hospital a great deal of the time, because all recognized from the first that his malady was serious, we think it very clear that no verdict in favor of plaintiff could be held adequately supported by the evidence.

The order must be affirmed.