## GLADYS AND PETER BUSH v. PETER J. CRESS.[1]

December 5, 1930.

Nos. 28,067, 28,068.

[1]Reported in 233 N. W. 317.

*J. A. Cashel,* for appellant.
*Hansen & Engan,* for respondents.

WILSON, C. J.

Defendant has appealed from orders denying his motions for judgment non obstante or a new trial in these actions, wherein the plaintiff Gladys Bush seeks to recover damages for malpractice, and her husband, Peter Bush, seeks to recover his alleged expenses in caring for his said wife necessitated by the alleged conduct of the defendant.

On March 9, 1927, defendant, a doctor, was called to attend Mrs. Bush in childbirth. She was also suffering with a cold, perhaps a light form of flu. The delivery was difficult. Her health did not permit the use of the usual amount of chloroform. There was some tearing. The doctor performed an episiotomy, which is an incision of the vulvar orifice during parturition. The doctor made an incision in the lower portion of the perineum to the extent of about one and a half inches. This permitted the child to be promptly delivered. He immediately proceeded to sew up the incision. He packed gauze sponges into the vagina to temporarily block the blood, in order to keep the field of operation clean, so that he could see to put in the stitches. When the sewing was completed he removed such sponges as he could remove with his fingers only. He did not think it advisable to probe for other concealed sponges. He acted upon the assumption that the remaining sponges would come with the afterbirth, which the doctor says he then delivered.

One of the sponges remained and was removed by the doctor 6 or 13 days later. Plaintiffs claim the failure to remove this sponge was negligence which resulted in septicemia, necessitating the removal of the left ovary and Fallopian tube. They also claim negligence in the failure of the doctor to make a proper diagnosis of the patient's condition, alleged to have been caused by the sponge.

The sponge was not left in the wound. Defendant says that the presence of the sponge was in no way the cause of the patient's trouble. He and other doctors testify that what he claims to have done was good practice according to the standards of his school of medicine. The defense claims that nature would in a week's time remove the sponge. It was discovered because it was apparently being so delivered.

■ Defendant made professional calls upon the patient several times during the balance of the month of March. She developed a temperature. Dr. Thorson was called on April 1. He examined her. He gave her a douche. He gave her strychnine tablets. He left other medicine which was given. He prescribed douches with warm water and lysol. His instructions were followed. Pursuant to a call from the acting nurse defendant called on April 4. He then examined the patient's womb. He advised that there was no danger of blood poisoning; that flu had settled in the glands; that she should take iron for her blood. He suggested that she would be up in eight or ten days. He also advised the continued use of applications of boiled lysol. He was then informed that Dr. Thorson had been consulted and was presently expected in response to a call. Defendant left. His advice was not followed, but that of Dr. Thorson was. Defendant denied making any examination or giving any advice on April 4. He claims that when he came he was told that Dr. Thorson had been there a few days before and that they were then waiting for him to again call. Defendant says that he consented to Dr. Thorson's taking the case and then left without making any examination or giving or prescribing any treatment.

Actions of this character must be commenced within two years. G. S. 1923, § 9193, as amended, 2 Mason, 1927, id. The statute of limitation does not commence to run until the treatment ends or the employment ceases. Schmitt v. Esser, 178 Minn. 82, 226 N. W. 196; Bush v. Cress, 178 Minn. 482, 227 N. W. 432. This action was commenced on April 3, 1929. If defendant's treatment or employment continued to and included April 4, 1927, the action is not barred. When did the relation of physician and patient end? It

may be that two doctors were desired. On April 4 defendant made the examination mentioned, that is, the jury could find that he did. He must have then considered that he was acting professionally. So also when he advised as to the condition on that day and the medicine to be taken. He came on April 4 in response to a call. It can hardly be supposed that he was asked to come some distance into the country to be informed that his services were no longer desired.

We are of the opinion that the evidence presented a controversial question of fact and that the court properly submitted the question to the jury. The evidence is sufficient to support the finding that the relation of physician and patient existed on April 4.

During the period that defendant attended the patient she at times had a high temperature. The doctor prescribed different medicines and treatment. He attributed the unfavorable conditions to the presence of the patient's cold or flu. Plaintiffs claim that the condition was attributable to puerperal infection caused by the failure to remove the sponge. The claim is that defendant was negligent in so failing to recognize and diagnose the patient's condition. This claim has no support from medical expert witnesses. It rests entirely upon the theory that laymen may draw an inference to that effect. Yet the doctor's duty in this respect necessarily involves judgment. Staloch v. Holm, 100 Minn. 276, 111 N. W. 264, 9 L.R.A.(N.S.) 712. In any event no liability can be impressed upon defendant on this theory, because his negligence must be established by competent witnesses who are qualified to speak in relation to such an important and delicate subject. The evidence in this record is insufficient to permit the jury to say that defendant was negligent in failing to make a seasonable and proper diagnosis of Mrs. Bush's condition. Thorkeldson v. Nicholson, 154 Minn. 106, 191 N. W. 269; Lorenz v. Lerche, 157 Minn. 437, 196 N. W. 564.

Dr. Thorson caused the patient to be taken to a hospital at Luverne on April 5. She remained there until April 20. Then she was at the home of her parents until August 27, when she returned to her own home. She had a temperature of 104 on April 4.

This disappeared ten days later. When she left the hospital on April 20 she was normal, except her "uterus was still a little large," and she was also in a weakened condition. The record does not disclose whether such enlargement was an incident to childbirth or due to the septicemia. The doctor examined her a month later and found her condition to be about the same. While at her parents' home she was in bed most of the time up to June. She was then "up and around." In August she "swept floors and things like that" but was not very strong. She continually suffered pain in her side.

In September Dr. Thorson examined the patient and found a change in the condition of the uterus. He says: "There seemed to be a mass there in the region of the left ovary, seemed to be a mass or something." On October 10 she submitted to a surgical operation in a hospital at Sioux Falls, South Dakota. The surgeon was not called as a witness. No witness attempts to disclose what occurred there. Dr. Thorson examined Mrs. Bush shortly before the trial and states that it seems as though the left ovary and the Fallopian tube had been removed. This was apparently done in the Sioux Falls operation. Mrs. Bush states that for a year after the child was born she was "unable to do but the lightest form of housework."

The record and the size of the verdict for Mrs. Bush would indicate that the jury acted upon the theory that the serious operation at Sioux Falls proximately resulted from defendant's negligence. The record is silent as to the nature and character of the "mass" in the region of the ovary. Its origin is left to conjecture. Whether it was the result of the presence of the sponge is a mere guess. Its relation, if any, to the enlarged uterus is not shown. The matter of cause and effect in a case of this kind is subject to very definite rules of evidence. So far as this record is concerned, the removal of the ovary and tube may have been necessary for reasons quite foreign to any conduct of defendant. It would seem that plaintiffs must be within reach of evidence to meet the legal requirements to show the facts necessitating such an operation, if such is the case,

and to disclose the cause of the trouble. There are cases where the layman may draw permissible inferences in relation to causal connection without the aid of medical expert testimony. Harju v. Allen, 146 Minn. 23, 177 N. W. 1015; Getchell v: Hill, 21 Minn. 464; Moehlenbrock v. Parke, Davis & Co. 145 Minn. 100, 176 N. W. 169; Fowler v. Scheldrup, 166 Minn. 164, 207 N. W. 177. But we are of the opinion that this is not such a case. The causal connection is not here established. Thorkeldson v. Nicholson, 154 Minn. 106, 191 N. W. 269; Lorenz v. Lerche, 157 Minn. 437, 196 N. W. 564.

■ An assignment of error is also based upon the admission of the testimony of Dr. Thorson, a graduate of an eclectic school of medicine. The record does not disclose whether this is a distinct school of medicine, but it seems clear that the witness was recognized as outside the allopathic school of medicine. In order to show a qualification to testify, Dr. Thorson said he knew the practice of allopathic doctors in childbirth cases. When asked how he knew, he said that in the medical school from which he graduated one of the textbooks used was King's *Obstetrics,* which is allopathic. He stated that he did not know of any difference in the treatment of these cases between his method and the school of allopathy. Upon this showing the doctor was erroneously permitted to testify. The rule is that a physician's professional standard of conduct and the necessities and proprieties thereof are to be tested by the evidence of those who are trained and skilled in his particular school of medicine. Nelson v. Dahl, 174 Minn. 574, 219 N. W. 941; Martin v. Courtney, 87 Minn. 197, 91 N. W. 487; Harju v. Allen, 146 Minn. 23, 177 N. W. 1015. The fact that Dr. Thorson studied one single allopathic textbook, which may or may not cover the entire field of childbirth and surgical operations incidental thereto, is insufficient. Whether such book is all-inclusive is for a member of the allopathic school to state. Here none has spoken. The fact that the witness of one school does not know any difference in the treatments of the two schools is meaningless.

There were expert allopathic witnesses who covered much the same ground as covered by Dr. Thorson in his general testimony, and

aside from his testimony in relation to his qualifications. These witnesses may have given sufficient testimony to have made a case against the defendant, and hence it is urged that if Dr. Thorson's testimony was erroneously received it was without prejudice. The difficulty with such argument is that we have no way of knowing how Dr. Thorson's testimony may have influenced some or all of the jurors.

Both orders are reversed and new trials are granted.

