## CORTES v. BALTIMORE INSULAR LINE, Inc.

### No. 357.

Circuit Court of Appeals, Second Circuit.

July 25, 1933.

MANTON, Circuit Judge, dissenting.

———

Hunt, Hill & Betts, of New York City (George Whitefield Betts, Jr., and H. Victor Crawford, both of New York City, of counsel), for appellant.

Jesse L. Rosenberg, of New York City (Basil O'Connor and William F. Snyder, both of New York City, of counsel), for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

Victor Manuel Santiago shipped as a seaman on the appellant's vessel for a voyage from New York Habor to Boca Grande, Fla., and return. On the return voyage he became ill of pneumonia, from which he died shortly after reaching the home port. This action was brought by his administrator under section 33 of the Jones Act (46 USCA § 688).

In a former opinion we held that the plaintiff could not maintain an action under the Jones Act for death alleged to have resulted from the shipowner's failure to perform its duty to furnish "maintenance and cure." 52 F.(2d) 22. This construction of the statute was reversed in Cortes v. Baltimore Insular Line, 287 U. S. 367, 53 S. Ct. 173, 77 L. Ed. 368. Stating that our opinion had assumed without decision that the care of the seaman had been negligent and that there was a causal relation between the negligence and the death, the Supreme Court remanded the cause to this court in order that these disputed issues of fact might be determined.

The vessel left Boca Grande in the late afternoon of Tuesday, October 16, 1928. Santiago reported himself sick the next day. Although disputed, there is some evidence that he was required to work on Wednesday morning after he had told the mate that he was sick. At noon he went to bed in his bunk in the forecastle, and his temperature was taken at 5:45 p. m. and was entered in the log as 104 degrees. It dropped to 102 degrees at midnight and rose again to 104 at 7 a. m. on the 18th. On the 19th at the same hour it was 103 degrees and was found to be the same on each morning thereafter during the voyage; that is, to and including Monday, October 22d. The vessel anchored off the mouth of the Raritan river at 6:35 p. m. on Sunday, where she lay until 6 a. m. on Monday, when she proceeded to her dock at Carteret, N. J., arriving about 8 a. m. At 3 p. m. an ambulance was called to take Santiago to the United States Marine Hospital. When he arrived at the hospital shortly before 6 o'clock, he was found to have lobar pneumonia with consolidation on both sides. The prognosis was expected mortality within twenty-four hours. He died early the next morning.

When Santiago took to his bed, the officers diagnosed his illness as a severe cold with fever, and gave him the customary treatment of quinine and cathartics and a light diet. The steward testified that he prepared special food, such as soups and orange juice, and sent it up by the mess boy. Some of the sailors denied seeing special food served to him. He was allowed to remain in the forecastle, and it is contended that these quarters were cold, damp, unsanitary, and equipped with insufficient bedding. No one was assigned to give him special care, except that the third mate administered medicine twice a day and the steward prepared his special food. There is testimony that he was unable to go to the toilet and that his clothing and bedding became filthy. Sometimes when he coughed he raised blood, and, after eating, vomited, but it does not appear that these facts were brought to the knowledge of the officers. He complained to them of aching head and aching bones such as might accompany a cold. It is contended that the forecastle was dangerously cold and damp because of open portholes and a defective drainage pipe, and that an additional blanket or heat from the steam pipes should have been supplied. But, in view of the outside

temperatures which only once fell as low as 60 degrees and in view of the medical testimony that fresh-air treatment is desirable for pneumonia patients, the jury would not have been justified in finding negligence in this latter respect. In general the charges of negligence are that the officers should have appreciated that the seaman was dangerously sick and should have given him better attention on board, or have made for an intermediate port to land him, or have obtained aid from passing vessels during the voyage, and, on arrival off the Raritan river, should have immediately summoned medical aid. Although the ship's officers cannot be held to the skill of expert physicians in the matter of diagnosis, we think there was evidence which justified submitting to the jury the question whether they used reasonable care in looking after the sick seaman. Certainly the jury might have found that it was negligent not to get him to a hospital more promptly, either Sunday evening after the vessel anchored, or Monday after she docked. While there was testimony that Santiago was seen on deck Sunday afternoon and the captain supposed him cured, the jury were not obliged to believe this evidence in preference to the testimony of seaman Lopez that he told the captain on Sunday evening that Santiago was very sick and should be sent to a hospital.

Granting that the jury could have found negligence, was there evidence from which they could find that such negligence was the cause of his death? We think not. There are four types of pneumonia, and in one of them, that caused by the Friedlander bacillus, the mortality is between 70 and 90 per cent., even with the very best hospital treatment. This was the testimony of Drs. Baldwin and Cornell. It was not contradicted by Dr. Kienzle, who was the physician in charge when Santiago was admitted to the hospital and who testified for the plaintiff. Although he stated that in his experience a pneumonia patient who received prompt and proper hospital treatment had a chance of recovery in the ratio of 88 to 100, he did not differentiate between the different types of the disease in making this statement, and it does not appear that his experience included the Friedlander type. It may even be inferred that it did not, as he always used the serum treatment, and the other doctors testified that medical authorities never prescribe serum for the Friedlander type. There is no direct testimony as to the type which Santiago had. This could only be determined by examining the sputum, and it does not appear that such an examination was made. His symptoms, however, particularly the coughing of blood, were consistent with the Friedlander type. If he had a disease so fatal that the chance of recovery was only 1 to 3 out of 10 even with the best of treatment, it seems to us pure speculation on the part of the jury to find that the failure to land him at an intermediate port, or to get him to a hospital more promptly after arrival, or the failure to give him more careful treatment aboard ship, was the cause of his death. Dr. Baldwin, in answer to a hypothetical question, answered, "From my knowledge of what happened here, I would think the man's death was predestined at the time he was taken ill aboard the ship."

It is true that Dr. Kienzle answered "Yes" to the following question: "Would you say, Doctor, that if Victor Manuel Santiago had been given reasonable medical treatment by the officers on board that ship after the 17th of October 1928, that his chance of surviving would have been greater than his chance of dying?" But this is scarcely equivalent to testimony that with reasonable certainty the defendant's neglect can be said to have caused the seaman's death. Moreover, it is subject to two further criticisms. The question does not disclose what the doctor considered "reasonable medical treatment by the officers." From other portions of his testimony it would seem that he thought a pneumonia patient on shipboard should receive the same treatment as in a hospital, except for the administration of serum. We do not think the owners of a coastwise freighter can be held to so high a standard. In addition, the doctor's opinion is subject to criticism because his entire testimony fails to show the type of pneumonia from which the seaman was suffering. Without medical testimony that it was one of the relatively less dangerous types, the jury could only speculate which it was, and, as we have already said, if it was the Friedlander type, a finding that death resulted from inadequate treatment could not be sustained. Because on this record a verdict for the plaintiff would be purely speculative, we think there was error in submitting the case to the jury. The causal connection between the defendant's breach of duty and the resulting injury or death must not be left to mere conjecture. Thorkeldson v. Nicholson, 154 Minn. 106, 191 N. W. 269, 270; C., M. & St. P. Ry. v. Coogan, 271 U. S. 472, 478, 46 S. Ct. 564, 70 L. Ed. 1041; Ketterer v. Armour & Co., 247 F. 921, 931, L. R. A. 1918D, 798 (C. C. A. 2); New York Cent. R. Co. v. Grimstad, 264 F.

334 (C. C. A. 2); cf. Harris v. Penn. R: Co., 50 F.(2d) 866 (C. C. A. 4).

█ The judgment was erroneous in including interest on the verdict from the date of death. Neither the Jones Act nor the Federal Employers' Liability Act (45 USCA §§ 51–59) permits the awarding of interest before the damages are judicially ascertained. Lynott v. Great Lakes Transit Co., 202 App. Div. 613, 195 N. Y. S. 13, affirmed 234 N. Y. 626, 138 N. E. 473; Murmann v. N. Y., N. H. & H. R. R. Co., 258 N. Y. 447, 180 N. E. 114; Chicago, M., St. P. & P. R. Co. v. Busby, 41 F.(2d) 617 (C. C. A. 9).

Judgment reversed, and cause remanded for a new trial.

MANTON, Circuit Judge, dissents.