**Vicky L. BENSON and Roger Benson, Appellants,**

v.

**Leonard JOHNSON, Jr., Defendant and Third Party Plaintiff, Respondent,**

v.

**AMERICAN FAMILY MUTUAL INSURANCE COMPANY, Third Party Defendant, Respondent.**

No. C2–86–28.

Court of Appeals of Minnesota.

Sept. 2, 1986.

Warren F. Plunkett, Peter Plunkett, Austin, for Vicky L. Benson and Roger Benson.

Terri J. Stoneburner, Farrish, Johnson & Maschka, Mankato, for Leonard Johnson, Jr.

Eric J. Magnuson, Rider, Bennett, Egan & Arundel, Minneapolis, Brandon LaSalle, Eden Prairie, for American Family Mut. Ins. Co., respondent.

Heard, considered and decided by POPO-VICH, C.J., and FOLEY and FORSBERG, JJ.

## OPINION

FOLEY, Judge.

This case arises from an automobile accident in October 1983 involving Vicky and Roger Benson and Leonard Johnson, who admitted liability for the accident. When a dispute arose over the amount of medical benefits to which Vicky Benson was entitled for injuries resulting from the acci-

dent, the trial court allowed Johnson to join American Family Medical Insurance Company, the Bensons' no-fault carrier.

The case proceeded to trial on the issue of damages only. By special verdict, the jury found that Vicky Benson had been disabled for over 60 days and awarded her $9,000 in compensatory damages. Roger Benson was awarded $1,000 for his loss of consortium claim. The jury refused to award any damages for medical expenses beyond those already paid by American Family or for future medical treatment and care.

On appeal, the Bensons claim that the trial court committed reversible error in allowing an American Family medical services employee to testify as an expert concerning the necessity of medical services and in allowing American Family to fully participate at trial in an adversarial manner. We reverse, remand for a new trial and dismiss the third-party complaint.

## FACTS

The Bensons commenced this negligence action against Johnson in November 1983. In answers to interrogatories, Vicky Benson stated that she had incurred over $4,000 in medical expenses as the result of the accident, but she refused to provide information on the amount of medical benefits paid by American Family, her no-fault insurer. Johnson's subsequent motion for an order compelling answers was granted. Upon receiving information that American Family had determined $2,843.95 to be the reasonable and necessary medical expenses, Johnson sought and obtained written consent from the Bensons to proceed against American Family as a third-party defendant pursuant to Minn.R.Civ.P. 14.01.

Prior to trial, American Family moved for dismissal of the third-party action, arguing primarily that Johnson lacked standing necessary to pursue the action. The motion was denied with the understanding that it could be renewed. On the day of trial, American Family renewed its motion without objection from the Bensons' counsel. The trial court took the matter under advisement and the case proceeded to trial.

At trial, conflicting evidence was presented regarding the permanency of Vicky Benson's injuries and her need for future medical treatment. The Bensons relied upon the testimony of three expert witnesses. Dr. August Schaub, Vicky Benson's treating chiropractor until June 1983, testified that in his opinion she suffered an 18% permanent partial disability of the spine but that after a July 1985 examination, she had improved "considerably."

Dr. Michael Kearney, an orthopedic surgeon, had examined Vicky Benson once in November 1983. He testified by deposition that x-rays of the cervical and thoracic spine showed the existence of a small ossicle (calcification), but that the results were otherwise normal. He explained that the ossicle does not cause the symptoms of headache, pain and depression complained of by Vicky Benson.

Dr. Alfred Anderson, a chiropractor and medical doctor, examined Vicky Benson twice at Dr. Schaub's request in April 1984 and in July 1985. Dr. Anderson concluded that she suffers a 20% permanent partial impairment of the spine. On cross-examination, he acknowledged that he was unaware that she had complained of headaches 10 months before the accident, that she had been placed on medication for shoulder pain in July 1983 and that she was having personal problems at the time of the accident. Dr. Anderson agreed that all these factors would be relevant in assessing a patient's condition.

Dr. Robert Fielden, an orthopedic surgeon, testified on behalf of Johnson. Dr. Fielden testified that all objective tests performed on Vicky Benson during a 40-minute examination in July 1985 were normal and concluded that she did not suffer any permanent injury. He further stated that there was no particular treatment that would benefit her, other than general encouragement to participate in exercise and normal daily activities, and concluded that she was not in need of future chiropractic treatment.

Dr. Wayne Boisen, a chiropractor, testified on behalf of American Family. Dr. Boisen examined Vicky Benson at the request of American Family in February 1984. Based on this examination and a review of her medical records, Dr. Boisen concluded that no documented evidence existed to support a finding of permanent impairment. In his opinion, many of her complaints could be attributed to anxiety and that, accordingly, she should have been able to resume all household activities after April 1984. Dr. Boisen did not believe that ongoing chiropractic treatment was necessary and instead recommended instruction in posture exercise and relaxation therapy.

When Jean Ann Nolting, an American Family medical services employee, was called to the stand, the Bensons made a motion in limine to restrict her testimony. The trial court ruled that Nolting could testify with respect to the medical costs incurred and could qualify as an expert in that field. It reserved decision, however, on her ability to testify as to the reasonableness and necessity of medical services provided until after foundation was laid.

Nolting testified that her primary responsibility at American Family was to review medical files and determine the appropriateness, necessity and reasonableness of medical charges incurred by insureds. She had held the position for five years and has a college degree. Nolting stated that in the week preceding trial, she and other technicians in her department had reviewed more than 100 files to determine the appropriateness of medical charges.

Over objection, she explained that American Family uses a number of methods to determine whether medical charges are usual and customary. The statistical methods include the Health Association of America (HIAA), a bi-annual publication that breaks down medical charges by zip code, and the California Relative Values Survey, a survey of California physicians recognized in Minnesota that assigns a value to medical procedures based on difficulty, expertise and time involved in the procedure. Non-statistical information is provided by outside consultants and peer review boards such as the Minneapolis based Foundation for Health Care Evaluations and the Professional Services Quality Counsel of Minnesota, composed of physicians from the Rochester and southern Minnesota areas.

Nolting testified that the same methods were used to review Vicky Benson's medical expenses. When asked to elaborate on what charges were reduced or disallowed and why, the Bensons' counsel objected on relevancy and hearsay grounds. The objection was overruled. Counsel then lodged a standing objection on the same grounds, but the trial court allowed Nolting to continue.

At the close of the evidence, counsel agreed that only the charges of Drs. Schaub and Anderson were disputed. Pursuant to the agreement, only those charges were submitted to the jury on the special verdict form. The jury found that Vicky Benson was not entitled to medical benefits over and above what had been paid by American Family. It further determined that Vicky Benson had not suffered permanent injury, that she was not in the need of future treatment and that she had not suffered a loss of future earning capacity. The jury did, however, award her $9,000 in compensatory damages and awarded Roger Benson $1,000 for his loss of consortium claim.

The Bensons moved for amended findings or a new trial, claiming inconsistency in the special verdict, error in the joinder of American Family as third-party defendant, error in the trial court's refusal to bifurcate the third-party action from the original claim and error in the admission of certain expert testimony. The trial court subsequently corrected its previous finding to reflect total medical benefit payments by American Family of $2,848.40 but denied all other post-trial motions. This appeal followed.

## ISSUES

1. Did the trial court abuse its discretion when it allowed American Family's

medical services employee to testify as an expert concerning the necessity of medical treatment?

2. Did the trial court clearly err in allowing American Family, joined by Johnson as a third-party defendant, to fully participate at trial in an adversarial position against its insured?

## ANALYSIS

1. *Opinion Testimony of Lay Witness.*

Minn.R.Evid. 702 provides in part:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ Whether a witness possesses the necessary skill, knowledge, experience or training to be permitted to testify as an expert is a matter to be resolved by the trial court in the exercise of its discretion. *Tayam v. Executive Aero, Inc.,* 283 Minn. 48, 52, 166 N.W.2d 584, 587 (1969). To reverse a trial court's ruling on the admission of expert testimony, not only must it be determined that the trial court abused its discretion, but also that the abuse of discretion resulted in prejudice to the objecting party. *Housing and Redevelopment Authority v. Kieffer Brothers Investment and Construction,* 284 Minn. 516, 521, 170 N.W.2d 862, 865 (1969).

The Bensons claim that such prejudice resulted here because Nolting was allowed to testify as to the *necessity* of medical treatment even though she had no formal medical training. They further assert that the prejudicial impact of the testimony was enhanced by the fact that it was provided by a representative of American Family, their no-fault insurer, and not from a witness provided by Johnson. We are similarly persuaded.

Three areas of Nolting's testimony and plaintiffs' objections are particularly relevant to our discussion:

Q. (By Mr. Spellman [attorney for American Family]) The American Family bill was submitted to the American Family Insurance Group for a missed appointment?

A. [By Nolting] Yes, it was. I'll find the date here. The date of that missed appointment was December 17th, 1983. We further disallowed charges for trace minerals in the amount of $9.00 that were billed on December 27th, 1983. Also, disallowed a charge of $15.00 for B-6 vitamins. That charge was billed on April 14th, 1984.

In regards to Dr.—

Q. Could you tell us the basis on which those two charges were disallowed?

A. *In regard to the trace minerals and B-6 vitamins, it is the feeling of the company, and this is from talking to various individuals in the medical field,* that—

MR. PLUNKETT [attorney for the Bensons]: We object. It's incompetent, irrelevant and immaterial and obviously based on hearsay. And we'd like to have a continuing objection.

THE COURT: Your continuing objection will be noted.

Q. (By Mr. Spellman) You may proceed.

A. *It is our position that a person, if they have a—I don't want to use the term irregular diet. But, they should be able to obtain these minerals through their regular diet and it's not necessary they obtain them by artificial means, nor if they're lacking them in their diet should it be considered necessary medical expense.*

\* \* \* \* \* \*

Q. And from your review of the file, was the American Family Insurance Group ever made aware that Dr. Schaub had elected to send Mrs. Benson to Dr. A.V. Anderson?

A. No.

Q. The first time that you knew about that was when you received the bill for review?

A. Yes.

Q. Again, having digressed, could you tell us what the amount of the total bill was?

A. $540.00.

Q. In dollar amounts, how much of that bill was reduced?

\* \* \* \* \* \*

A. Okay. He had billed a charge of $190.00 for a new patient comprehensive history and physical. He had also billed a charge for $250.00 for thermography and $100.00 for a submaxilla bike test. We had reduced the initial comprehensive history and physical from $190.00 to $116.00, which is the usual and customary fee for an examination of that type.

Q. That usual and customary fee, was that established based upon the studies that you previously referred to?

A. Yes.

Q. And those would have been done under the norms that were established for treatment in the Minneapolis area?

A. Yes.

\* \* \* \* \* \*

Q. What other reduction was made in the bill?

A. We disallowed the $250.00 charge for the thermography and the $100.00 charge for submaxilla bike charge.

Q. For what reason was the $100.00 charge disallowed for the submaxilla bike test? Can you, first, tell us: How was Dr. Anderson notified of the disallowance?

A. All right. A letter was sent to him on July 6th, 1984.

\* \* \* \* \* \*

Q. *With respect to the treatment of the bill, was there further workup by you?*

A. *In regards to the bill itself, we did receive information subsequently regarding the submaxilla bike test.*

Q. *Who did you receive that information from?*

A. *From the Foundation for Health Care Evaluation. That's the physician*

*peer review board that I spoke of earlier.*

Q. *Is this one of the organizations where you periodically refer many charges for review?*

A. Yes.

Q. And what information did you receive from that foundation?

A. *The information we received from there, I have a copy of that. May I read from that?*

Q. *Would you tell us what the information showed?*

A. *Okay. It showed that the test was not a valid diagnostic test.*

Q. Is that the basis upon which you disallowed the $100.00 fee for that test?

A. Yes.

MR. PLUNKETT: Your Honor, we'll object to that question on the grounds it's incompetent, irrelevant and immaterial, based on hearsay. And it's attempting to inject into the case what is necessary for medical procedure under the circumstances.

THE COURT: This is part of your standing objection, I believe, Mr. Plunkett, isn't it?

MR. PLUNKETT: Well, she's been talking about reasonable expenses. Now she's talking about a necessary medical expense. She says this isn't necessary. We object to it on the ground, because she's not competent to testify on that ground. She's not a medical doctor.

THE COURT: The objection is overruled.

\* \* \* \* \* \*

Q. Now, there was an additional charge. There was a third charge as a part of that bill?

A. Yes.

Q. What was that charge in amount and what did the bill that was submitted to American Family show that it was for?

A. It was a charge in the amount of $250.00 for a neurothermography test.

Q. Was that portion of the bill paid?

A. No, it was not.

Q. Was that portion of the bill disallowed?

A. Yes, it was.

Q. Can you tell us why that bill was disallowed—that portion of the bill was disallowed?

A. *It is the policy of the company, which is based on information we received from the American Medical Association, that the thermography is not a valid diagnostic tool.*

Q. *What information have you received from the American Medical Association?*

A. *We received a copy of an article that was printed in their journal from March of 1983 which indicates that information.*

Q. *That's the American Medical Association Journal?*

A. *Yes.*

MR. PLUNKETT: We move to strike that on the grounds of hearsay.

THE COURT: Objection is overruled.

(Emphasis supplied.)

Nolting is a five-year medical services employee who deals primarily with the mechanics of insurance claims. While her occupational background may properly qualify her as an expert with respect to medical charges incurred and the reasonableness of those charges, she was not competent to testify as an expert regarding the necessity of medical treatment. This lay witness was permitted to testify concerning the professional judgment by Vicky Benson's doctors as to recommended treatment and was likewise permitted to testify concerning her source of information, all of which she relied upon for the truth of such hearsay statements. Her testimony was in clear violation of the hearsay rule.

In the case of medical witnesses, the supreme court has required "both sufficient scientific knowledge of and some practical experience with the subject matter of the offered testimony." *Cornfeldt v. Tongen,* 262 N.W.2d 684, 692 (Minn. 1977). Nolting had neither the medical training nor the practical experience to either form or express an expert opinion on the necessity of Vicky Benson's recommended medical treatment. *See Marose v. Hennameyer,* 347 N.W.2d 509 (Minn.Ct. App.1984) (lay person not qualified to give opinion on the need for future medical care). "The rule is that a physician's professional standard of conduct and the necessities and proprieties thereof are to be tested by the evidence of those who are trained and skilled in his particular school of medicine." *Bush v. Cress,* 181 Minn. 590, 595, 233 N.W. 317, 319 (1930).

There is a clear distinction between allowing reports contained within business records under Minn.R.Evid. 803(6), which are part of on-going business proceedings, and offering an opinion in open court on a subject the witness is not competent to express. In the former case, *National Tea Co. v. Tyler Refrigeration Co.,* 339 N.W.2d 59 (Minn.1983), is instructive. In the latter case, as here, admission of the testimony was prejudicial error. Nolting is not an expert in medical diagnosis. Her incompetent testimony tainted the verdict and compels the granting of a new trial on the issue of damages only.

2. *The Joinder of the No-Fault Carrier.*

In their briefs, Johnson and American Family argue that the Bensons are estopped from claiming error in the joinder of American Family as a third-party defendant since they consented in writing to the joinder pursuant to Minn.R.Civ.P. 14.01. At oral argument, however, Johnson conceded that the consent obtained by operation of Rule 14.01 was ineffective since his claim against American Family, *the Bensons'* no-fault insurer, was not predicated against one "who is or may be liable to him for all or part of the plaintiff's claim against him." *Id.*

Johnson now focuses his argument that joinder was proper on Minn.R.Civ.P. 19.01. The trial court was similarly satisfied:

[J]oinder here is appropriate under Rule 19.01, Minn.R.Civ.P., which provides in part that "[a] person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties * * *."

We do not agree with the trial court's analysis. Joinder is not called for under either Rule 14.01 or Rule 19.01 in this case.

It was never contemplated by any provision of the No-Fault Act, Minn.Stat. § 65B.41–.71 (1984), that the insurance carrier be placed in an adversarial position against its insured as part of the tort action against a third party. Even where the plaintiff has consented to consolidation of claims against her no-fault insurer and the defendants in an action, such consent does not carry with it the right of the insurer to fully participate at trial as an adversary.

In *Ferguson v. Illinois Farmers Insurance Group,* 348 N.W.2d 730 (Minn.1984), the supreme court reaffirmed its holding in *Haugen v. Town of Waltham,* 292 N.W.2d 737 (Minn.1980), which suspended the set-off provisions of Minn.Stat. § 65B.51 as to deduction of future economic loss benefits until the legislature remedied the problem. Addressing the trial court's restricted application of *Haugen* to those circumstances where the no-fault insurer was *not* a party to the action, the *Ferguson* court stated:

> The presence of the insurer in this suit does not alter the holding in *Haugen.* The entry of a *money* judgment against the no-fault carrier is not mandated at this time since the tortfeasor is responsible for respondent's losses.

*Id.* at 733 (emphasis in original). As *Ferguson* illustrates, the standard of proof to recover *damages* against a tortfeasor is quite different from what is required under the contract between an insured and his or her no-fault carrier with respect to recovery of economic loss benefits.

In *Tuenge v. Konetski,* 320 N.W.2d 420 (Minn.1982), this distinction was recognized when the jury awarded the plaintiff $3,063 in lost wages, while the no-fault insurer had already paid her $11,115 for the same item of damage. The supreme court stated:

> This situation is not unique nor does it necessarily result from the fact that plaintiff's insurer overpaid her with respect to loss of wages. Rather, it can be expected that this disparity between wage loss benefits paid by an insurer and wage loss damages awarded by a jury may frequently arise. At trial, *wage loss must be proved in an adversarial setting by a preponderance of the evidence. There is no such standard for the collection of basic economic loss benefits.* At any rate, even if plaintiff's insurer did overcompensate her, this is a matter between plaintiff and her insurer and does not influence our construction of the Act.

*Id.* at 422, n. 2 (emphasis supplied).

■■■ The relationship between the insured and his or her carrier under the No-Fault Act is such that *fault* is irrelevant. The purposes of the Act include: "(1) To relieve the severe economic distress of uncompensated victims of automobile accidents within this state * * * (5) * * * to provide offsets to avoid duplicate recovery." Minn.Stat. § 65B.42(1), (5) (1984). Clearly, the rationale behind the Act would be frustrated if a no-fault carrier is allowed to participate at trial in a manner similar to a tortfeasor.

In the present case, American Family, the no-fault carrier, improperly assumed an active confrontational position against its insured throughout the trial. Instead of lessening the prejudicial impact of this action, the trial court compounded the error by failing to instruct the jury on the limited role American Family played in the case. In a case of this nature, the Bensons' failure to object to the instructions prior to submission to the jury is not fatal. The error was fundamental and could be raised in a post-trial motion, as was done here. *See* Minn.R.Civ.P. 51.

■■■ The Bensons additionally claim that the third-party and main action should have been bifurcated. Johnson and American

Family assert that this issue is untimely since it was not raised until the post-trial motion. While it would have been more prudent for the Bensons to raise the bifurcation issue in a timely manner, we think the issue deserves consideration.[1] If American Family was properly in the case at all, the trial court should have bifurcated the proceedings sua sponte and considered separately the rights of the Bensons and their no-fault insurer as derived from their contractual relationship and as established by statute.

The reasoning behind Johnson's joinder of American Family is apparent. The Bensons' action against Johnson sought to recover non-economic losses. The Bensons, therefore, bore the burden of proving at least one of the tort threshold requirements of Minn.Stat. § 65B.51, subd. 3 (1984). The Bensons' complaint sets forth facts bearing on these threshold requirements: reasonable and necessary medical expenses exceeding $4,000, and allegations of disability of at least 60 days and permanent injury.

By joining American Family, Johnson could be assured that the carrier would be bound by the judgment and also argue that the reasonable value of the Bensons' medical expenses was the precise amount already paid—$2,843.95. If the jury accepted this argument, as it did here, Johnson stood to gain approximately $2,000, the difference between the amount of medical benefits paid and the medical expenses claimed.

■ A second reason for joinder of the no-fault carrier is also evident in this case and illustrates unfair consequences. With the joinder of American Family, Johnson was able to strengthen his own position against the Bensons. Throughout the trial, American Family joined Johnson in every aspect of the case, including the reasonable value of medical expenses, permanency of the injury, future medical expenses and loss of earning capacity. The trial proceed-ed on defendants' side with two opening statements, two cross-examinations and two closing statements. The net result was prejudice to the Bensons and a windfall to Johnson.

■ Not to be overlooked is the part arbitration plays in settling disputes in no-fault cases. Unfortunately, a copy of the insurance policy between the Bensons and American Family was not made a part of the record on appeal. Since we are reversing and remanding this case for a new trial, however, we make particular note that "court determinations [have] no effect on arbitrations where the parties by their insurance contracts had agreed to the arbitrators deciding questions of fault and damages, not a jury." *Eckblad v. Farm Bureau Mutual Insurance Co.*, 371 N.W.2d 78, 82 (Minn.Ct.App.1985), *pet. for rev. denied*, (Minn. Sept. 26, 1985); *see also National Indemnity Co. v. Farm Bureau Mutual Insurance Co.*, 348 N.W.2d 748 (Minn.1984). If the Bensons' no-fault policy made similar provisions for arbitration, the jury's resolution of the dispute over the reasonableness of Vicky Benson's medical expenses would be accorded whatever weight the arbitrators deem justified. *See Milwaukee Mutual Insurance Co. v. Currier*, 310 Minn. 81, 88, 245 N.W.2d 248, 252 (1976).

Simply stated, a no-fault carrier's active and confrontational role at trial against its insured, like oil and water, do not mix. We are cited to no case in support of the theory that the Bensons' no-fault carrier is or could be liable to the tortfeasor. Clearly, no privity of contract exists between the two, nor does an independent basis exist for indemnification. The contract of insurance here entails a set of rights and obligations that are personal to the Bensons. Johnson derives no benefit whatever from this contractual relationship except to the extent that he is entitled to offset benefits actually paid by the insurer. *See* Minn. Stat. § 65B.51, subd. 1 (1984).

1. A no-fault carrier participating side-by-side with the tortfeasor as an adversary to its own insured is repugnant to the meaning and pur-pose of the No-Fault Act, and ample authority is contained in Minn.R.Civ.App.P. 103.04 for us to review and settle the law on this issue.

Accordingly, under either Rule 14.01 or Rule 19.01, American Family was improperly joined as a necessary party. American Family's participation in the trial was so intertwined with the tortfeasor and so supportive of the tortfeasor's claim as to render meaningless the objectives of the No-Fault Act. Such an erroneous joinder operated to taint the entire verdict.

### DECISION

The trial court clearly abused its discretion in allowing a medical services employee of the no-fault carrier to testify as an expert medical witness concerning the professional acts and conduct of Vicky Benson's treating physicians and the necessity of their treatment. Joinder of the Bensons' no-fault carrier in the tort action was improper. We reverse and remand for a new trial on damages between the Bensons and Johnson and dismiss the third-party action.

Reversed, remanded and third-party action dismissed.